CITY OF WINTER HAVEN v. STATE, ex rel. CARY D. LANDIS, Attorney General.

170 So. 100
Opinion Filed October 10, 1936.

394

*Henry Sinclair,* for Plaintiff in Error;

*Cary D. Landis,* Attorney General, *Touchton & Crittenden* and *W. H. Poe,* for Defendant in Error.

BROWN, J.—We are dealing here with a judgment of ouster in a *quo warranto* proceeding brought against the City of Winter Haven as a municipal corporation in the name of the State on the relation of the Attorney General, no co-relators being joined. The effect of the judgment was to reduce the area of the City from about four and a quarter square miles to one square mile. The judgment was based mainly upon two alleged defects in the description of the city's boundaries as set forth in Chapter 11299 of the Acts of 1925, known as the "charter act" of the thereby newly incorporated City of Winter Haven, which Act established the same boundaries for the *City* of Winter Haven as had been previously established by Chapter 9959, Acts of 1923, for the *Town* of Winter Haven, which town was originally incorporated in 1917 with one square mile of territory. The judgment was also based upon the holding that the Act of 1925, Chapter 11301, which purported to include the territory of the former town of Florence Villa, and other territory, within the boundaries of the City of Winter Haven, was invalid because of an unconstitutional delegation of legislative power as to when the Act should go into effect.

The City filed motion to quash, and also demurred to the information on the ground that it showed no right to the issuance of the writ as against the public interests involved, the State having recognized the validity of the City and its boundaries for some ten or eleven years, and other grounds relating to the sufficiency of the description of the boundaries, which demurrer was sustained to the original information; but both motion and demurrer were overruled when interposed to the information as later amended so as to set up an additional alleged defect in the boundary description, and so as to attack the validity of Chapter 11301, which Act purported to embrace within the city the territory of the abolished town of Florence Villa.

The City declining to plead further, judgment of ouster was rendered, to which the City sued out this writ of error.

The legislative acts dealing with the Town, and later the City, of Winter Haven might be briefly reviewed as follows:

The Legislature of Florida in 1917 passed Chapter 7723, by which there was established the Town of Winter Haven, its charter created and its boundaries set, which comprised one square mile of territory, and there was also provided in said Act certain powers delegated to the Town.

In 1923 the Legislature of Florida, by Chapter 9959, passed an Act establishing the territorial boundaries of the Town of Winter Haven, which said Act described and set out exactly the same boundaries as those that are questioned in this case. The Legislature of that same year passed another Act, being Chapter 9955, which said Act authorized the Town of Winter Haven to levy and collect taxes on the property described in Chapter 9959 for the year 1923 and subsequent years.

Under authority of Chapter 6940, General Laws, Acts

of 1915, a charter board was elected and a charter drafted and an election had on the 27th day of November, 1923. The charter so drafted was adopted, and in said charter the same boundaries described in Chapter 9959 of 1923 were set out and described.

In 1925 the Legislature adopted said Chapter 11299, which Act abolished the Town and created the "City of Winter Haven" and ratified and confirmed the charter election of November 27, 1923, embraced and enacted the charter provisions as a part of the Act, and again set out and described the same boundaries. This is the Act which is being attacked in this proceeding on the alleged ground that there are two breaks in the boundary description, which prevent a closure of the boundary line.

The Legislature of Florida at the same session (1925) passed Chapter 11301 establishing new boundaries so as to include the former town of Florence Villa (abolished by the Act) within the boundaries of the City of Winter Haven, and also to include a large area of additional territory. This Act (Chapter 11301) has been held effectual only insofar as it annexed the territory of the former town of Florence Villa. See State, *ex rel.* Landis, Attorney General, *et al.,* v. City of Winter Haven, 154 So. 700, 114 Fla. 199.

Since the passage of Chapter 11299, Acts of 1925, the Legislature passed in 1925 Chapter 11300, which was an Act granting certain powers to the City of Winter Haven in regard to the making of local improvements and the issuance of bonds to pay for the same: Chapter 11301, as above mentioned; Chapter 11302, which was an Act to amend Sections 18 and 88 of the City Charter as described in said said Chapter 11299; Chapter 11304, which was an Act empowering the City of Winter Haven to issue certain fund-

ing bonds, and each of said Acts were approved by the Governor of Florida respectively on June 1, 1925, June 2, 1925, and May 15, 1925.

In 1927 the Legislature passed Chapter 13556, which was an Act to amend Section 88 of the Charter Act as the same has previously been amended by Section 2 of Chapter 11302 of 1925. This Act was approved by the Governor on April 3, 1927. During the same session of the Legislature an Act was passed authorizing the City of Winter Haven to issue $450,000.00 worth of bonds for the purpose of financing local improvements, being Chapter 13,557, and approved by the Governor May 7, 1927.

In 1931 the Legislature passed Chapter 15,996, being an Act to amend Sections 3, 4, 5, 7, 8, 67, 84, 85, and 102 of the Charter Act of Winter Haven, which was Chapter 11299, Acts of 1925. This Act was approved by the Governor, June 15, 1931. The Legislature in the same session passed Chapter 15,597, which was an Act to empower the City of Winter Haven to provide for zoning, and the Governor approved the same June 15, 1931.

In 1933 the Legislature passed Chapter 16,768, which was an Act amending Sections 3, 4, 5, 7, 67, 74, 75, 81, 84, 85, 86 and 102 of the Charter Act of the City of Winter Haven, and the same became a law without the Governor's approval.

. In the case of State, *ex rel. Landis,* Attorney General, *et al.,* v. City of Winter Haven, 114 Fla. 199, 154 So. 700, which was a quo warranto case in which the State on the relation of the Attorney General and certain individual co-relators sought to oust the City from jurisdiction of certain lands added to the municipal territory by said Chapter 11301, this court held that, on account of the language of the title, the Act was sufficient only to include within

the territorial limits of the City of Winter Haven all of that territory which immediately prior to the passage of the Act was included within the territorial limits of Florence Villa, "but it was ineffective to include any of that territory beyond the limits of Florence Villa, and beyond the limits of the City of Winter Haven as described in Chapter 11299, Special Act 1925." The last paragraph of the opinion in that case reads as follows:

"Accordingly, the judgment should be reversed, with the directions that a judgment of ouster be entered against the respondents as to all territory lying outside of the territory embraced within the city of. Winter Haven as established by Chapter 11299 and the territory embraced in the town of Florence Villa at the time of this annexation by Chapter 11301."

The language so used indicates that the court was of the opinion and so held, that Chapter 11301 was sufficient to embrace within the territorial limits of the city the territory within the limits of Florence Villa immediately prior to the passage of the Act and within the limits of the City of Winter Haven as described in Chapter 11299.

The present quo warranto proceedings seeks to nullify the effect of said Chapter 11301 entirely, upon the ground that the Act has never gone into effect. This attack was made in the last amendment to the information and is based upon Sections 7 and 8 of Chapter 11301. If this question is not *res judicata* under the decision just above cited and quoted from, we nevertheless consider that the question so raised is without merit. Sections 7 and 8 of Chapter 11301 reads as follows:

"Section 7. This Act shall take effect only upon the affirmative vote of more than two-thirds of the total vote cast at a special election to be held for the approval or

disapproval of this Act within sixty days after same would have become law had no referendum election been provided for herein. The said election shall be called by proclamation of the Mayor-Commissioner of the City of Winter Haven, and said proclamation shall be published once a week for a period of fifteen days preceding said election in a newspaper of general circulation published in the said City. All persons residing within the old territorial limits of the City shall be duly qualified voters under the charter and ordinances of the city, for general elections, shall have a right to vote at said election, and all persons actually residing within the new territory, who have reached the age of twenty-one years and who shall register with the City Clerk for said election within three days of the day of the election, shall have the right to vote at said election. The City Commission shall name the election officials for the said election, same to consist of three inspectors and a clerk, and shall duly canvass the election returns of the election and declare the result thereof. The ballot used at the said election shall provide for a plain affirmative and negative vote on the approval or disapproval of this Act, and the form thereof shall be specified by resolution of the City Commission. No contest of this election shall be instituted after sixty days from the date of canvassing the returns.

"Section 8. This Act shall take effect upon its passage and approval by the Governor, or upon becoming a law without the approval of the Governor, and upon its approval at the special election provided for in Section 7 hereof."

The positive commands of Section 7 as to the calling of the election and the method of advertising, holding and conducting the same, the qualifications of voters and the

canvassing of the returns and the declaration of the result thereof, clearly indicate that it was the firm intention of the Legislature that those provisions should go into effect upon the approval of the Governor or upon the Act becoming a law without his approval. It was clearly the legislative intent that the election should be promptly held in accordance with the requirements of Section 7 but that the Act as a whole should take effect only upon the affirmative vote of more than two-thirds of the total votes cast at such election. This intent is clearly shown by the language of Section 8. The argument of defendant in error that, by its language, no part of the Act could go into effect until an election was held, and that there was no law providing for the election until the Act went into effect, is ingenious, but unconvincing. The intention of the Legislature is too plain, nor are we impressed with the argument that these provisions of the statute amount to an unlawful delegation of legislative power, by giving to an administration official the sole power of deciding whether the people will be allowed to vote on the effectiveness of the whole Act. This court has frequently held that the Legislature may enact a statute complete in itself and provide that it shall go into effect upon the happening of a contingency, such as the affirmative vote at an election provided for in the Act. See State v. Sammons, 62 Fla. 303, 57 So. 196; Nabb v. Andreu, 89 Fla. 414, 104 So. 591; P'Pool, et al., v. State, ex rel., Attorney General, 93 Fla. 378, 112 So. 59; Ex Parte Lewis, 101 Fla. 624, 135 So. 147; State, ex rel. Crim, v. Juvenal, 121 Fla. 69, 163 So. 569; Sparkman v. County Budget Commission, 103 Fla. 242, 137 So. 809. The provisions of the Act passed upon in the P'Pool case is from a legal standpoint practically identical with the provisions of Chapter 11301. To apply a separate rule to the two

Acts would amount to a reversal of the effect of the decision in the P'Pool case above cited.

It might be contended with considerable force that the decision of this court in State, *ex rel.* Landis, Attorney General, v. City of Winter Haven, *supra,* is *res judicata* of the question of the sufficiency of the boundaries of the City of Winter Haven as established by Chapter 11299, adopted in 1925. It is true that the alleged breaks in the description of the boundaries now insisted upon may not have been brought to the attention of the court in that case, but it also may well be that such could have been done. However, we do not think it necessary to decide this question, as there is another more important question which we deem to be decisive in the instant case. We might observe however, that it is not contended that the Act, or the boundary description therein, is void on its face. The contention is that when the line described in the Act is attempted to be run upon the land in accordance with the description, it discloses that there are at least two points where there is a break in the line, which results in a failure of the statute to fully enclose a definite body of land within the city limits as written in the statute. It is just as earnestly contended on the part of the city that if the line be run on the ground in accordance with the rule laid down by this court in Town of Gulfport v. State, *ex rel.* Davis, Attorney General, 104 Fla. 245, 140 So. 192, it is by no means impossible to ascertain and determine the municipal limits described in the Act. The rule referred to is that where there is a conflict between calls between courses and distances on the one hand and fixed points or monuments on the other, courses and distances must give way to such fixed points or monuments and the description will be held to be according to the calls as established by such fixed points and

monuments. In the description in that case the word "South" was eliminated from the Act as surpluses, in accordance with this rule, and the statutory description upheld as sufficient to make a complete boundary. See also Milam, *et al.*, v. Davis, 97 Fla. 916, 123 So. 668; State v. Sammons, 62 Fla. 303, 57 So. 196; and McQuillan Mun. Corp., Sec. 281.

We pass now to a consideration of the main question in this case. The exact point has never been decided by this Court. Briefly stated, the question is: May the State, after nine to eleven years of acquiescence in and recognition by the Legislature and the Governor, of the valid existence of the municipal corporation, be precluded to attack the boundary structure, or the validity of the creation, of the municipality? Or may the courts properly exercise their discretion to withhold the granting of a judgment of ouster in quo warranto at the suit of the State in such cases? These two questions are so closely allied as to practically form one question.

It must be borne in mind that municipal corporations must have boundaries or they have no existence. Enterprise v. State, 29 Fla. 128, 10 So. 740; Johnson v: Owens, 92 Fla. 356; 109 So. 423. McQuillin on Municipal Corporations, Second Edition, Sec. 281. The municipality, the *City* of Winter Haven, had no boundaries by legislative enactment until the passage of the Charter Act, Chap. 11299 of 1925, and if the boundaries were now held to be invalid for uncertainty of description, the very existence of the municipal corporation would be jeopardized. It is a grave situation and presents a serious problem to the citizens of the municipality, which according to the census of 1930 had a population of 7,130. If the State of Florida, after having created the municipality, and having not only acquiesced in

its existence for over nine years before the bringing of this suit, but also after having affirmatively recognized its existence in a number of legislative Acts, and in actions by the State in the courts of this State, may now, at this late date, be permitted to come into the courts of the State and demand a writ of quo warranto to oust the city from jurisdiction over the territory that has been under the city's jurisdiction since 1925, because of some boundary defect, what city in the state has any assurance of its continued existence and stability as a municipality if perchance some technical error might be found in the description of its boundaries, traced by the Legislature perhaps many years ago, and which error might cause a small hiatus or break in such boundaries? And what public purpose can be subserved by the judgment of ouster sought in this case, in which the State, more than nine years after the City of Winter Haven was created by the State, and more than eleven years after the Town of Winter Haven acquired jurisdiction over this territory, in effect asks the court to abolish the City of Winter Haven?

It must be kept in mind also that, generally speaking, the writ of quo warranto is recognized in this State as a discretionary writ. It is not a writ of right but issues in the sound discretion of the court. State, *ex rel.* Davis, v. City of Eau Gallie, 99 Fla. 579, 126 So. 124; 51 C. J. 328. This is rightly so, for the writ, or at least a judgment of ouster thereunder, is one which may have drastic consequences affecting the public weel. In McQuillin on Municipal Corporations, Second Edition, Section 176, it is said:

"A state may, after long acquiescence and recognition of a municipal corporation, be precluded from proceeding by information to deprive it from exercising the rights ac-

quired by it from the general law. Thus where a municipal corporation has been recognized by enactment of the Legislature, ordinarily all inquiry into the original organization is precluded; and in such case, after long continued use of corporate powers, and the acquiescence of the public in them, the law will indulge in presumptions in support of their legal existence. It is universally affirmed that when a Legislature has full power to create corporations, its Act recognizing as valid a *de facto* corporation, whether private or municipal, operates to cure all defects in steps leading up to the organization, and makes a *de jure* out of what before was only a *de facto* corporation."

And again in Section 306 of the same work it is said:

"As in original creation, the law will indulge in presumptions in favor of the validity of changes of boundaries. Thus, after public acquiescence for a considerable period, presumptions in favor of the regularity of proceedings to attack territory to a municipal corporation will be indulged, and this is true although irregularities appear which would have defeated the annexation if action had been taken in time. So where territory is annexed under a law which is unconstitutional because special in its character, and the city exercised municipal functions over the new territory for a period of four years without objection, and its operation would be seriously interfered with by holding annexation void, it was held that the complainant would be estopped from urging the validity of the annexation."

In the case of State, *ex rel.* Roberson, v. Town of Pell City, 157 Ala. 380, 470 So. 246, it was held that where the people of a locality, having incorporated themselves under color of law into a municipal corporation, and it having exercised all the functions of such a duly organized corpo-

ration for sixteen years, and the State having during that time by several Acts of the Legislature duly recognized it as. a municipal corporation, in a proceeding by the State to dissolve it by reason of a claimed irregularity in its organization, writ of quo warranto will be refused on the ground of laches, and the discretion of the court to refuse judgment of ouster, if in its opinion the interest of the public do not require such judgment, may properly be exercised. In the opinion of Mr. Justice Denson in that case it was said:

"In 2 Spelling, Extraordinary Relief, p. 1468, Sec. 1803, the principle of acquiescence by the state and consequent loss of right to dissolve a municipal corporation is asserted in this language: Aside from the rule of public policy which prevails in this country against the forfeiture of the charter of a municipal corporation, it is held that the state may, by long acquiescence in the existence and acting as such by a municipality, become barred from proceeding against it through its officers to forfeit its franchises; although its original organization may have been irregular and not in accordance with the general laws of the state.' The author, in support of the text, cites the case of State v. Leatherman, 38 Akr. 81, which we find upon investigation, is a well-considered case and a leading one on the subject in hand. The case was a proceeding by the Attorney General, by quo warranto, to annul the charter of a *de facto* corporation of eight years' standing, and in it the Supreme Court of Arkansas held 'that the state by long acquiescence and continued recognition of a municipal corporation, through her officers, may be precluded from filing an information to deprive it of franchises long exercised in accordance with the general law.' We shall not quote from the case further, but remark in passing that the

reasons for applying the doctrine of acquiescence against the state are in the opinion of the court forcefully and lucidly set forth."

"In the case of Jameson v. People, 16 Ill. 257, 62 Am. Dec. 304, which was a proceeding by quo warranto to inquire into the organization of a municipal corporation, instituted four years after the town was incorporated, the Legislature had enacted laws concerning the town and the public had recognized it as a municipal corporation. The court held that because of *laches* on the part of the State it was deprived of the right of inquiring into the validity of the corporation. The court in part, said: "Municipal corporations are created for the public good, are demanded by the wants of the community, and the law, after long-continued use of corporate powers and the public acquiescence, will indulge in presumptions in favor of their legal existence. The law will incline to sustain, rather than to defeat, them. It would seem incompatible with good faith and aginst public policy, although irregularities may have intervened in the organization of the town, now to hold that it is not a body corporate.' The case of State v. Town of Westport, 116 Mo. 582, 22 S. W. 888, was one by quo warranto to annul the charter of a city on account of irregularities that had intervened in the organization proceedings had under the general laws of Illinois. In it the court discussed and followed the cases of State v. Leatherman, *supra,* and Jameson, v. People, supra. In the opinion is found this reasoning: 'If there is to be no limit to such proceedings and if at any period of time, however remote from the time of the organization of a municipality, a proceeding by quo warranto can be resorted to, and such municipality and its officers ousted of their franchises because of irregularity in its organization, it would effectually

destroy the credit of municipalities generally to such an extent as to render it impossible to grade and improve their streets, or to construct any kind of improvements promotive of the health, welfare and convenience of their inhabitants, and issue bonds or tax bills in payment thereof. People would be unwilling to labor for such cities, and capitalists to invest in their bonds, for fear of their disorganization. Notwithstanding only 12 years had elapsed from the irregular organization until the filing of the information, the court held that the state was deprived of the right to dissolve the corporation on the grounds of laches."

See also State, Minnesota, v. Village of Harris, 102 Minn. 340, 113 N. W. 887, 13 L. R. A. N. S. 533; People v. Alturas County, 6 Idaho, 418, 44 L. R. A. 122; State v. Pawnee County, 12 Kan. 426; People v. Maynard, 15 Mich. 463; Attorney General v. City of Matheun, 236 Mass. 564, 129 N. E. 662.

In the case last above cited the opinion in part reads as follows:

"Estoppel does not apply ordinarily against the exercise of a public right, and the interests of a commonwealth usually are held not to be prejudiced by the failure of public officers to do their duties. This rule prevails generally. In the absence of some special statutory provision, the principle applies to quo warranto proceedings instituted by the Attorney General in behalf of the commonwealth. It commonly had been held. There is, however, another principle to be considered in this connection. The granting of relief by quo warranto even when sought at the instance of the Attorney General in behalf of the public, is not a matter of absolute right but is a subject for the exercise of sound judicial discretion. It is the duty of the court to consider all the conditions, including immediate and remote conse-

quences, and to determine with a broad vision of the public weal whether on the whole the common interests demand the issuance of this extraordinary writ. Where the legality of the organization of a municipality is concerned, then even the Attorney General in his public capacity can not, as of right, demand the issuance of quo warranto. His application must be considered in all its bearings as related to the general welfare. One of the grounds on which quo warranto was denied in Commonwealth v. Athearn, 3 Massachusetts 285, 287, was said by Chief· Justice Parsons, at page 287 that: * * * in the present case it would not be a discreet and proper exercise of their authority.' As Lord Mansfield in King v. Stacey, 1 Term Reporter 1, said: 'The Courts are bound to consider all the circumstances of the case before they disturb the peace and quiet of any munic-ipal corporation.'

"Where important public rights have become affected and there has been considerable delay, sound judicial dis-cretion may require denial of affirmative action and refusal to oust a municipality from the exercise of its franchises. This proposition is supported by the great weight of au-thority, and no decision to the contrary has come to our attention."

One of the leading cases on this question is State of Iowa, *ex rel.* West, v. City of DesMoines, 31 L. R. A. 185.

The principle laid down in the above cases had been rec-ognized by this Court in quo warranto cases instituted to oust municipalities from exercising jurisdiction over rural lands annexed to and brought within municipal corporate limits where such lands were entirely outside the radius of municipal benefits. In such cases the information was filed on the relation of the Attorney General joined by complain-ing property owners as corelators. For instance, in the

case of State, *ex rel.* Davis, Attorney General, *et al.,* v. City of Eau Gallie, 99 Fla. 579, 126 So. 124, on page 126 of the text, this court recognized that estoppel by acquiescence can work against a property owner as a corelator to preclude him from asserting individual rights, and it was also stated that in such cases a writ of quo warranto is not a writ of right but a discretionary writ. In the same case this court said:

"The Attorney General asserts no grounds upon which a writ of quo warranto may be issued except the private rights which have been waived; the Legislature has by the later statutes above referred to recognized the existence of the municipality as being valid; therefore, the writ of ouster in quo warranto should not be granted. (See Atty. Gen. v. Metheun, 236 Mass. 564, 129 N. E. 662."

In State, *ex rel.* Landis, Attorney General, *et al.,* v. City of Coral Gables, 120 Fla. 492, 163 So. 308, it was held that owners of lots which had been included within the boundaries of the city for eight years were estopped from questioning the validity of the city boundaries established by the Legislature, notwithstanding changes in the ownership of the lots. In the opinion in that case it was said:

"It appears from the answer that the co-relator and his predecessors in title have acquiesced for so long a time in the action taken by the Legislature in establishing the boundaries of the City, that it is now estopped to question the validity of such action. Nor does it appear from the information that the State at Large, as represented by the Attorney General, has any interest in now attacking a boundary status which has so long existed under legislative enactment, it not being made to appear that any public rights are adversely affected. See State v. City of Sarasota, 92 Fla.

563, 109 So. 473, State v. City of Clearwater, 106 Fla. 761, 139 So. 377; State v. Eau Gallie, 99 Fla. 579, 126 So. 124."

The only statement in the information in this case that has any semblance of bearing on public rights is merely the statement that the city is exercising jurisdiction over the territory involved "in violation of the Constitution and laws of the State of Florida and without lawful authority thereof and against the peace and dignity of the State of Florida and to the wrong and prejudice of the property owners and the inhabitants of said territory." No allegations of facts showing any harmful encroachment upon public rights, or that public rights are being adversely affected, is made, nor are there any facts alleged which would indicate that the rights or property owners are in any way invaded or illegal taxes being levied upon them; nor does it appear that any of such property owners have made any complaint or are asking for any relief. State v. City of Sarasota, 92 Fla. 563, 109 So. 473. Nor is there a single allegation of fact which would show that the public interests will be benefited by a judgment of ouster in this case. The judgment of ouster against the city is claimed as a naked legal right. Had the information been filed promptly after power was assumed by the city over these lands, the allegations of the information might have been *prima facie* sufficient to withstand the demurrer and motion to quash, but coming at this late day our conclusion is that such demurrer and motion should have been sustained and the action dismissed.

As above observed, this exact question has never been passed upon by this court before. Doubtless, the learned trial judge was governed in his action by the general rule that neither laches nor estoppel can be set up as against the sovereign State. There are decisions to that effect, and in

our own case of State v. Smith, *et al.*, 16 Fla. 175, it was said:

"It has long been well settled by judicial decisions that laches cannot be imputed to government. Governments transact business through agents only, and cannot, like private persons, be subjected to the observance of such sharp and close rules of conduct as may be exacted of individuals in their commercial dealings with each other. If it were not so, by the connivance of sureties, for instance, with the agents of government, it might be made impossible to enforce the bonds of its financial officers."

There are exceptions to all rules, and this court has recognized some of these exceptions. While the State may not ordinarily be estopped from the exercise of its sovereignty or police powers, or from acting in vindication or enforcement of public rights by the laches or neglect of its officers, agents or servants, there are many cases which hold that even the sovereign State may be estopped under certain circumstances and conditions. Indeed, the general doctrine seems to be that the state may be estopped from attacking the validity of a municipal corporation, where for years the state has recognized the existence of the municipality by legislative action, and has acquiesced in the exercise of its powers, and where the public interests do not require that the State shall take such drastic action as would result in the destruction or paralysis or crippling of the municipal corporation. See 10 R. C. L. 704-706, and cases cited; 21 C. J. 1106 and cases cited; and also the cases hereinabove discussed and cited. And this court in State v. Beardsley, 77 Fla. 803, 82 So. 794, held that where the state had assessed property of a decedent to his testamentary trustee, and the state sued the trustee for the taxes, it would not be permitted to show that the property was held

in a different fiduciary capacity. We have held that counties and municipalities may be estopped. In State v. Thursby, 112 Fla. 257, 150 So. 252, it was held that where county commissioners had made an appropriation for a county fair and had approved an assessment from the Fair Association to a bank, they were estopped from denying the obligation of the county to the bank. See also Miami. v. Fla. E. C. Ry. Co., 79 Fla. 539, 84 So. 726. And we have held in a long line of cases that a municipality may be estopped to deny that its authority to issue bonds, vested in the municipality by a valid statute, was properly exercised in the issuance of the bonds, especially where such bonds had passed into the hands of *bona fide* holders for value. State v. Greer, 102 So. 739, 88 Fla. 249.

Some of the decisions in other jurisdictions in cases of this kind, where writ of quo warranto, or judgment of ouster thereunder, was denied to the state, base their holdings upon the exercise of a sound discretion on the part of the court, rather than upon the ground of estoppel or laches, strictly speaking. In exercising such discretion, a court may and should consider all the circumstances of the case, including lapse of time and circumstances which would establish laches, acquiescence or estoppel as against a private person or corporation, and whether the public interest will be served by allowing the information to be filed or judgment of ouster thereunder granted. See 51 C. J. 328; 22 R. C. L. 727-729. It may refuse the writ, or judgment of ouster, upon considerations of public policy, interest or convenience. In other words, the court, on an information for quo warranto, may consider whether or not, under all the circumstances of the case, the public interests call for the exercise of its discretion in favor of the applicant. While the Attorney General, acting in behalf of the State, has the

discretionary power to file the information, the court, even after the writ is issued, may entertain and act upon demurrers to the information and motions to quash the writ. It may also exercise its discretion in either the granting or withholding of judgment of ouster. Where the judgment of ouster which is sought would cause confusion or disaster in the administration of the affairs of a municipality, and it does not appear that its refusal would be detrimental to the public interests or prejudicial to the constitutional rights of citizens, duly claimed and asserted, the court has the power to quash the information after it is filed, or to refuse judgment of ouster. Even when the sovereign goes into one of its own courts as a party litigant and seeks the benefit of the use of one of the court's discretionary writs, it must do so subject to the settled law and rules governing the granting and enforcement of such writ. It has been said that the American citizen bows his knee to no earthly power save the law of the land; and even the State itself, as a litigant, is not superior to its own laws and to those well settled principles of jurisprudence which govern the administration of justice according to law in its courts.

The judgment of the court below will accordingly be reversed, with directions to sustain the demurrer to the information as amended, grant the motion to quash the writ, and dismiss the action.

Reversed with directions.

WHITFIELD, C. J., and ELLIS, TERRELL and BUFORD, J. J., concur.

DAVIS, J., disqualified.