ZEHMER, Judge.
In these consolidated cases, University Community Hospital and Lakeland Regional Medical Center, Inc., two hospitals located in District 6, appeal a final order of the Department of Health and Rehabilitative Services (HRS) ruling that the inventory of neonatal intensive care unit (NICU) beds for District 6 shall include 11 Level II NICU beds for Winter Haven Hospital, Inc. HRS ruled that, under the circumstances, it was estopped to exclude these beds from *1344 the inventory. We reverse and remand for further proceedings on the estoppel issue.
I.
This controversy arose after HRS rule 10-5.01 l(l)(v) [now 10-5.042], Florida Administrative Code, became effective on August 6, 1990. That rule provides that all facilities providing NICU services must obtain a certificate of need (CON) for Level II and III NICU services after the rule’s effective date. The rule provides an exception for beds that are included in an initial inventory of such facilities by HRS. The rule sets forth the criteria for obtaining a CON, and states that such beds may be included in the initial inventory of Level II NICU beds provided the hospital is able to satisfy one of three grandfather provisions in rule 10-5.011(l)(v)14.a., 14.b., or 14.f. of the Florida Administrative Code.
In August 1990, HRS published in the Florida Administrative Weekly (16 Fla.Admin.W. 3906) a “Notice of Preliminary Inventory Hospitals Authorized to Provide Neonatal Intensive Care (NICU) Services” that listed the number of beds for each of the major categories within a hospital’s total licensed beds. The preliminary inventory included 11 Level II NICU beds for Lakeland Regional, but Winter Haven and University Community were not included in this inventory. Winter Haven advised HRS that it had been improperly excluded from the inventory and submitted documentation to support its contention that it should have been included. That documentation showed that approval had been given by HRS’s Office of Licensure and Certification to Winter Haven’s plans for construction of an NICU unit, based on a CON exemption letter dated July 9, 1985. In September 1990, HRS published a Notice of Change to the preliminary inventory that included 11 Level II NICU beds for Winter Haven (16 Fla.Admin.W. 4414).
On October 10, 1990, Lakeland Regional filed a petition for a formal administrative hearing to contest the September 1990 Notice of Change to the preliminary inventory indicating 11 NICU beds for Winter Haven, arguing that Winter Haven had no authorized NICU beds and failed to satisfy the criteria stated in rule 10-5.011(l)(v) for authorization to provide Level II NICU services. Winter Haven also filed a petition for administrative hearing to challenge the October 1990 Notice of Change to the preliminary inventory of Level II NICU beds increasing the number of beds awarded to Lakeland Regional, based on the argument that Lakeland Regional failed to satisfy the rule requirements for operation of that number of beds. Winter Haven and Lake-land Regional then filed separate petitions to intervene in each other’s case, and the two cases were consolidated. University Community, having a pending CON application to operate an NICU service, filed a petition to intervene in both cases challenging the inclusion of Level II NICU beds at both Lakeland Regional and Winter Haven. Only the Winter Haven beds are involved in this appeal, however.
The matter went to hearing before a DOAH hearing officer. Winter Haven contended that it qualified under the rule’s grandfather provisions as these provisions had previously been interpreted by HRS. It based this contention, in part, on evidence that HRS had previously approved NICU beds for Winter Haven and that, in reliance on this approval, Winter Haven had done a number of things to fund and place the NICU beds so authorized in operation. However, Winter Haven had not employed a full-time neonatologist on its active staff prior to October 1, 1987, as specified in the grandfather provisions of the rule, because its neonatologist did not come on board until April 1988.
The hearing officer’s order recommended that HRS exclude all of Winter Haven’s beds from the NICU inventory in view of its non-compliance with all relevant provisions in subparagraphs 14.a. through 14.g. of the NICU rule. We quote a portion of the findings and conclusions made in support of this recommendation: *1345 developed to the particular service stage required during the time period referenced in the rule. When HRS reviewed the documentation provided by Winter Haven to support its contention that it had been improperly omitted from the preliminary inventory, it became apparent that Winter Haven had relied upon prior authorizations of its Level II unit development from HRS. As the agency had not addressed the possibility that some Level II neonatal intensive care units might have reached considerable development before and after the time period referenced in the rule, these type[s] of situations were not covered by the NICU Rule. Instead, once situations were discovered, HRS created an unpro-mulgated policy that allowed hospitals with Office of Licensure and Certification-approved construction plans to have NICU beds placed on the preliminary inventory.
*1344 Evidence adduced at the hearing demonstrates Winter Haven is unable to meet the conditions specified in the rule which allow for the grandfathering of its Level II NICU beds. The unit was not
*1345 The agency’s attempted modification of the grandfathering provisions of the NICU Rule by use [sic] an unpromulgat-ed policy that departs from the specific meaning of the rule is a practice specifically forbidden by Section 120.68(12), Florida Statutes. In Boca Raton Artificial Kidney Center, Inc. v. DHRS, 493 So.2d 1055 (Fla. 1st DCA1986), the appellate court ruled that an agency cannot modify its own rules by unpromulgated policy even if it explicates such departure on a case-by-case basis. If a rule is found to be impractical, the agency’s recourse is to amend the rule pursuant to rulemaking procedures.
It is clear from the wording of the grandfathering provisions that the NICU Rule was primarily designed to be exclusive as opposed to inclusive. In certain situations such as those experienced by Winter Haven, the rule as written impairs the obligation of contracts and detrimentally affects a hospital’s interests. Winter Haven reasonably relied upon earlier authorizations given by HRS under color of law when the hospital made expenditures and established neonatal intensive care service in its district between 1977 and 1990.
In spite of the harms caused by the exclusion of hospitals in Winter Haven’s situation by the grandfathering provisions, the NICU Rule cannot be expanded through unpromulgated policy to include providers with approved construction plans. Such a policy would cause the provisions of sub-subparagraph 14.b. to become meaningless. This type of effect on a promulgated rule by an un-promulgated policy constitutes an impermissible deviation from the terms of an existing rule. Hillsborough County Hospital Authority d/b/a Tampa General Hospital v. Department of Health and Rehabilitative Services and Lakeland Regional Medical Center v. Department of Health and Rehabilitative Services, 12 FALR 785 (Final Order 1990). Accordingly, Winter Haven’s 11 Level II NICU beds cannot remain on the preliminary inventory published pursuant to Rule 10-5.011(l)(v)(15), Florida Administrative Code, which purports to include all facilities with authorized neonatal intensive care services based upon the provisions of sub-subparagraphs 14.a. through 14.g. of the NICU Rule.
Winter Haven filed exceptions to the recommended order, contending that the recommended order had misconstrued the meaning of the rules. It emphasized that the hearing officer’s construction of the rule, as found in the hearing officer’s recommended order, was contrary to that previously followed by HRS, on which Winter Haven had relied when establishing the level II NICU beds. Winter Haven further contended that, if HRS were not permitted to adhere to its previous construction of the rule but required to follow the hearing officer’s recommended construction, thereby preventing application of the grandfather provisions to Winter Haven, HRS was nevertheless estopped from excluding Winter Haven’s beds from the inventory because the facts found in the recommended order satisfied all of the elements of estop-pel. Winter Haven cited a number of Florida cases recognizing the application of equitable estoppel in administrative law *1346 cases.[1] This was the first time the matter of estoppel had been mentioned in these proceedings.
HRS entered a final order adopting all of the hearing officer’s findings of facts. It also approved the hearing officer’s construction of the rule as precluding the inclusion of Winter Haven’s 11 level II NICU beds in the inventory pursuant to the grandfather provisions. With respect to Winter Haven’s contention that the doctrine of equitable estoppel would apply based on the facts found by the hearing officer, HRS noted that:
... Winter Haven relied on representations by the department over a five (5) year period to establish its Level II NICU unit, hire employees, and commence operation of it. About 1300 babies are born annually at Winter Haven and about 10% of those babies require intensive care in the Level II unit.
HRS ruled that the “facts constitute exceptional circumstances for purposes of an equitable estoppel” and declined to exclude Winter Haven’s NICU beds from the inventory for District 6.
II.
On this appeal, University Community and Lakeland Regional challenge the application of estoppel on several grounds. While we do not agree with all of these contentions, we do agree that it was error for HRS to apply the doctrine of estoppel without first affording these two hospitals an opportunity to confront this issue in the evidentiary hearing before the hearing officer. Although it would appear from the findings of fact that application of the doctrine of estoppel to the circumstances shown might well be appropriate, it is premature for this court to address this substantive issue before the matter can be properly presented to the hearing officer. We reach this conclusion for the following reasons.
Estoppel, whether being asserted as the basis for a claim of right or as an affirmative defense, ordinarily must be pleaded in administrative cases when one expects to obtain relief based thereon. See Southeast Grove Management, Inc. v. McKiness, 578 So.2d 883 (Fla. 1st DCA 1991). See also rules 60Q-2.004, 60Q-2.010, and 28-5.203, Fla.Admin.Code. In court proceedings, a party’s failure to plead an issue usually precludes the fact-finder from ruling on the issue. See, e.g., Godshalk v. City of Winter Park, 95 So.2d 9 (Fla.1957); Brown v. Broward Minority Builders Coalition, Inc., 431 So.2d 230 (Fla. 1st DCA 1983); Sanders v. Bureau of Crimes Compensation, 474 So.2d 410 (Fla. 5th DCA 1985). The requirement for pleading specific issues is necessary because “parties to civil and criminal proceedings, whether judicial or administrative, are entitled to notice of the issues, as a matter of due process.” Conklin Center v. Williams, 519 So.2d 38, 39 (Fla. 5th DCA 1988). See also Deel Motors, Inc. v. Department of Commerce, 252 So.2d 389 (Fla. 1st DCA 1971). The rules of pleading are not applied in administrative proceedings as strictly as they are in court proceedings, however.
It is the ultimate responsibility of HRS in this licensing proceeding to exercise its discretion to make the correct decision based on an accurate, understanding of the facts. The section 120.57(1) evidentiary hearing before the hearing officer is an important part of the agency’s decision-making process in this permitting matter, but the recommendations of the hearing officer are not conclusive on the ultimate decision of the agency. Thus, while HRS was undoubtedly bound to accept the findings of fact made by the hearing officer so long as they were supported by competent, *1347 substantial evidence, HRS was nevertheless free to disagree with the hearing officer’s recommended conclusions of law and was authorized to apply its own understanding and interpretation of the law when entering its final order. § 120.-57(l)(b)10, Fla.Stat. (1991).
In this case, HRS agreed with the hearing officer’s findings of fact and accepted them without change, and did not err in doing so. But in reaching its final decision, HRS concluded on the basis of these facts that it was estopped from changing its prior decision authorizing Winter Haven to operate NICU beds in the face of Winter Haven’s substantial reliance thereon. We are not aware of any provision of substantive law that would preclude HRS from applying estoppel in this situation so long as the elements of estoppel are supported by the evidence and HRS deems that it is necessary to reach a legally correct and just decision. Nor do we conclude that Winter Haven’s failure to raise the estoppel issue in preliminary pleadings should operate as a conclusive waiver of its right to rely on this issue before HRS reached a final decision. As in court proceedings, the procedure must afford reasonable opportunity to amend the issues if necessary to reach a just result in conformance with the evidence. In view of the findings of fact in the recommended order, Winter Haven’s exceptions appropriately raised this issue similar to a motion to amend the complaint to conform to the evidence in a court proceeding.
Procedurally, however, University Community and Lakeland Regional were not afforded an opportunity to address the estoppel issue in the section 120.57 hearing before the hearing officer. Since the application of estoppel, like a finding of negligence, is often a mixed issue of law and fact, we agree with these appealing parties that they have been deprived of their right to an evidentiary hearing on this issue. The appropriate procedure that should have been followed, once it became apparent to HRS that estoppel was a relevant issue in reaching its decision, was for HRS to refer the matter back to the hearing officer for further evidence and findings of fact on that issue. See Fire Defense Centers v. State, Dept. of Ins., 548 So.2d 1166 (Fla. 1st DCA 1989), rev. denied, 560 So.2d 233 (Fla.1990); Inverness Convalescent Center v. Department of Health and Rehab. Servs., 512 So.2d 1011 (Fla. 1st DCA 1987); Friends of Children v. Department of Health and Rehab. Servs., 504 So.2d 1345 (Fla. 1st DCA 1987). Because that was not done, we reverse the order and remand the cause to HRS with directions that it be referred to the hearing officer for additional evidence on the estoppel issue, if University Community and Lakeland Regional so request, and for the entry of additional findings of fact as may be appropriate to the estoppel issue.
III.
One further issue needs to be addressed before remand. University Community and Lakeland Regional contend that the presence of the grandfather provisions in rule 10-5.011(l)(v), which Winter Haven failed to satisfy, precludes the application of equitable estoppel in this case, citing to our opinion in State, Department of Environmental Regulation v. C.P. Developers, Inc., 512 So.2d 258 (Fla. 1st DCA 1987). They read that opinion as precluding, as a matter of law, the application of estoppel in a permitting case where the statute involved includes grandfather provisions.
We do not agree that our decision in C.P. Developers precludes the application of es-toppel under the circumstances shown in this case. In C.P. Developers, the circuit court granted a partial summary judgment for the developers of certain property (the Stonebridge site) in their suit against the Department of Environmental Regulation for declaratory judgment to determine DER’s jurisdiction to require further permitting of that project under the Warren S. Henderson Wetlands Protection Act of 1984. The developers contended that in 1983, before the October 1984 effective date of that act, a DER representative had established and flagged a line, which was essentially coincidental with a +2 foot *1348 mean sea level (MSL) contour line, and effectively demarked DER’s jurisdiction of wetlands waterward of this line. DER disputed both the location of this line and that the flagged line was intended to establish its jurisdictional boundary, and asserted that the developers had illegally proceeded with construction of the project without obtaining the proper dredge and fill permits. C.P. Developers sought a declaratory judgment from the trial court
(1) that pursuant to the October 1983 jurisdictional determination, DER had no regulatory authority over C.P. Developers’ dredge and fill activities on the Sto-nebridge site; (2) that DER’s dredge and fill jurisdiction over the Stonebridge property was limited to the area water-ward of the +2 foot MSL contour elevation; and (3) that DER was equitably estopped to deprive C.P. Developers of the right to develop the Stonebridge property in accordance with the jurisdictional determination provided in October 1983.
512 So.2d at 260.
On DER’s appeal from the adverse partial summary judgment, we held “that genuine issues of material fact exist concerning whether the October 1983 jurisdictional determination encompassed more than phase one of the Stonebridge development, and whether the +2 foot MSL contour elevation line actually delineated DER’s pre-Henderson Act jurisdiction.” Id. at 261. We further held that C.P. Developers had not complied with the procedures set forth to implement the grandfather provisions in the Act for validating jurisdictional lines determined by DER prior to 1984 and thus had not validated the flagged line under those provisions. Finally, we held that, “since there are disputed issues of material fact with regard to the October 1983 jurisdictional determination, we find the doctrine of equitable estoppel to be inapplicable in this case,” and explained:
The record in this case reflects that there is a dispute concerning the extent of the October 1983jurisdictional determination, and the validation of that jurisdictional determination. Therefore, C.P. Developers alleged reliance on the pre-Henderson Act jurisdictional determination is not a sufficient basis upon which to invoke the doctrine of equitable estoppel against the state_ Furthermore, the availability of grandfather procedures to preserve a viability of a pre-October 1, 1984, jurisdictional determination precludes the application of estoppel against the state in this case....
Id. at 262-63 (emphasis added).
Our decision in C.P. Developers should not be read as broadly prohibiting the application of estoppel in any case where a grandfather provision is included in the statutory scheme. Rather, its precedential value on this point must be limited to the unusual circumstances involved in that case. We held that C.P. Developers’ purported reliance on the disputed jurisdictional line determination allegedly made by DER was unavailing in that case only because the nature of that dispute precluded any right on the part of C.P. Developers to rely on that line as a jurisdictional determination. Additionally, the grandfather provisions in the Henderson Act were specifically designed to preserve pre-1984 jurisdictional determinations of the sort on which C.P. Developers claimed reliance, but C.P. Developers had not complied with the procedures contained in implementing rules adopted by DER for validating such prior jurisdictional determinations. Thus, we concluded that C.P. Developers could not use the doctrine of estoppel as a substitute for avoiding the validation procedure designed to accomplish the same result.
Our decision in C.P. Developers is materially distinguishable and thus inapplicable to this case. Here, the hearing officer found that prior to the adoption of rule 10-5.011, HRS had given, in the form of written approval by its Office of Licensure and Certification to Winter Haven’s construction plans, effective authorization for Winter Haven to construct and operate its NICU unit, and that Winter Haven had relied thereon. Indeed, the hearing officer specifically found that:
14. During the years in which the NICU Rule was created, HRS did not consider the possibility that some hospi- *1349 tais might have progressed in the development stage of Level II NICU beds to such a level that the promulgated rule would contradict prior agency approvals reasonably relied upon by these hospitals.
HRS admits to the facts and conduct upon which Winter Haven claims to have relied, quite unlike DER’s denial that a jurisdictional determination had been made in the C.P. Developers case.
The order is reversed and the cause is remanded for further proceedings in accordance with this opinion.
REVERSED AND REMANDED.
SHIVERS and KAHN, JJ., concur.

. The list included City of Winter Haven v. State ex rel. Landis, 125 Fla. 392, 170 So. 100, 108 (1936); Noble v. Yorke, 490 So.2d 29, 31 (Fla.1986); Harris v. State, Dept. of Admin., 577 So.2d 1363, 1366-67 (Fla. 1st DCA 1991); Quality Shell Homes & Supply Co. v. Roley, 186 So.2d 837, 840 (Fla. 1st DCA 1966); Salz v. Department of Admin., 432 So.2d 1376, 1378 (Fla. 3d DCA 1983); Warren v. Department of Admin., 554 So.2d 568 (Fla. 5th DCA 1989), rev. dismissed, 562 So.2d 345 (Fla.1990); Tri-State Systems, Inc. v. Department of Transp., 500 So.2d 212, 216 (Fla. 1st DCA 1986), rev. denied, 506 So.2d 1041 (Fla.1987).