[Civ. No. 20429. Second Dist., Div. Three. Feb. 14, 1955.]

ISIDOR STENZOR et al., Appellants, v. JOSEPH LEON, Respondent.

[Civ. No. 20466. Second Dist., Div. Three. Feb. 14, 1955.]

LOS ANGELES CLOAK JOINT BOARD, INTERNATIONAL LADIES' GARMENT WORKERS UNION, Plaintiff and Appellant, v. JOSEPH LEON, Defendant and Appellant.

Basil Feinberg for Appellants in No. 20429 and Plaintiff and Appellant in No. 20466.

Phillip W. Silver for Respondent in No. 20429 and Defendant and Appellant in No. 20466.

SHINN, P. J.—Isidor Stenzor, on behalf of a certain labor union, appeals from a judgment of the superior court denying confirmation of two awards of an arbitrator. Joseph Leon, an employer, appeals from an order taxing costs which denied him certain claimed costs. The appeals have been consolidated.

Los Angeles Cloak Joint Board, International Ladies' Garment Workers Union, is a labor union and Isidor Stenzor is a member and manager thereof. Los Angeles Coat and Suit Manufacturers' Association is an organization of coat and suit manufacturers. Joseph Leon was a member of the association but resigned therefrom on or about October 16, 1953. January 19, 1951, an agreement was entered into by and between the association and the union which became immediately effective and remained operative until April 30, 1954. Although Leon had a right to resign from the association, the contract provided that he should continue to remain per-

sonally and individually liable ''under and to the terms and provisions of the agreement,'' regardless of his resignation, for the full term of the contract, but only while he continued to be a manufacturer of coats and suits.[1]   In his letter of resignation, Leon stated that his firm ''does not authorize the association to negotiate any new agreements in it's behalf that will extend beyond April 30, 1954.   This firm wishes to remain within its controllability obligation with the Union until April 30, 1954 as the present contract stands.''

The contract provided for increases of wages whenever there was a rise of 5 per cent in the cost of living index of the United States Bureau of Labor Statistics above the level of February 15, 1948.   The provision is set out below.[2]   There were other provisions recognizing the union as the bargaining agent of all employees and the association as the bargaining agent of its members.   They had acted in that capacity in the

[1] ''17 (c) In the event a member of the Association or his successors or assigns shall resign or be expelled from the Association, said expelled or resigned member of the Association or his successors or assigns shall be and continue to remain personally and individually liable under and to the terms and provisions of this Agreement, regardless of such resignation or expulsion from the Association, but only while he operates as a manufacturer, merchant, jobber, or wholesaler of coats and suits, as defined herein.   Said expelled or resigned member shall thereafter be required by the Union in addition to conform to the requirements of Paragraph (b) of this Paragraph 17 relating to contracts with independent employers.''

[2] ''The parties recognize that during the period of this Agreement, there may be a further inflationary trend resulting in an additional increase in the cost of living.   The parties hereto agree that if the cost of living index of the United States Bureau of Labor Statistics shall rise 5% above its level as of February 15, 1948, the Union shall have the right to demand, upon notice in writing to the Association, that all of the members of the Association shall increase the wages of all of their workers in all of the crafts covered by this Agreement who are employed in their inside shops and in the shops of their contractors, to bring the same into line with such increase in the cost of living.   The Union shall have the same right during the term of this Agreement with respect to any further 5% increase in the cost of living, as reflected by the index figures of the United States Bureau of Labor Statistics. The Union, however, agrees that if it demands an increase in wages pursuant to this paragraph for any subsequent time, such demands shall be made either on or before October 15 of the year (the increase granted to become effective for work performed beginning with the ensuing spring season), or on or before May 1 of the year (the increase granted to become effective for work performed beginning with the ensuing fall season).   If the Union and the Association fail to agree upon the amount of wage increase to be granted, then the matter shall be submitted to the Impartial Chairman, hereinafter designated, for his final determination, and the parties agree to be bound by his decision. The provisions of this paragraph shall only be applicable for the period during which the emergency caused by the present inflationary trend shall continue.''

past and the agreement provided that they intended to continue bargaining in the future in the same capacity.

In April 1953, the union made request upon the association for a cost of living increase under section 12 of the agreement. As a result of negotiations the agreement was modified by increasing wages of craft workers $4.00 a week and floor workers $3.00 a week, effective November 2, 1953. There were certain other modifications which were deemed to be of value to employees.

Leon resigned October 16, 1953; October 22, the union made a written demand upon him that he increase wages 15 per cent; October 30, Leon had a conference with a union representative in which the union repeated its demand for a 15 per cent increase. Leon did not agree but did not refuse to negotiate further. October 27, the union communicated with Dan A. West, the Impartial Chairman, requesting that a hearing be arranged. The charge was that Leon had failed to increase wages by 15 per cent. October 30, the Impartial Chairman set a hearing for November 6 and gave notice to Leon. The hearing was adjourned to November 10. Leon and his attorney appeared before the Impartial Chairman, denied that there was any controversy subject to arbitration and challenged the jurisdiction and authority of the Impartial Chairman to proceed in the matter. November 20, at the conclusion of the hearing, which was attended by Leon under protest, the Impartial Chairman rendered an award that Leon should pay employees in certain crafts $3.50 per week above their present wage and members of other crafts $4.50 per week above their present wage, said increases to be retroactive to July 1, 1953, and to be paid forthwith to all eligible workers. December 2, 1953, a supplemental award was made for the purpose of enforcing compliance with the November 20 award. The union petitioned the court for confirmation of the awards and Leon petitioned that they be vacated. The judgment of the court vacated the awards and the union has appealed.

One ground for vacating the first award was that the arbitrator had no jurisdiction to determine the amount of wages which Leon should pay. This is the only ground of the decision which we need consider.

The powers of the arbitrator were derived from the agreement (*Bierlein* v. *Johnson*, 73 Cal.App.2d 728 [166 P.2d 644]; *Drake* v. *Stein*, 116 Cal.App.2d 779 [254 P.2d 613]; 6 C.J.S. p. 219) and we therefore look to the agreement.

All members of the association agreed to be bound by agreements entered into by the association with the union. All disputes between the association and its members and the union and its members were to be adjusted in the manner provided in the agreement. The union insists that Leon was bound by the original agreement until April 30, 1954 and it therefore contends that he was bound by the provisions for the increase of wages to meet increased cost of living and for the submission of wage disputes to the Impartial Chairman. Leon does not deny that he was bound by the agreement until April 30, 1954. The Impartial Chairman specifically found that Leon remained bound by the original agreement but that when he resigned he "abrogated" the authority of the association to negotiate on his behalf for an increase of wages. The first finding was correct; the second was in direct conflict with the first and with the express provisions of the agreement. Moreover, in his letter of resignation while negotiations between the association and the union were under way, Leon recognized the authority of the association to negotiate terms which would be binding upon him until April 30, 1954. The union, while insisting that Leon was bound by the provisions for increase of wages and for submission of a dispute to the Impartial Chairman, denies that he was bound by the modifications agreed to by the association. Leon insists he was bound by the entire agreement and that the union was likewise bound. We think there can be no reasonable difference of opinion upon this point. The contract obligated Leon to abide by any modifications agreed to by the association with respect to a cost of living increase in wages during the life of the original contract. There was no evidence that he was unwilling to pay the increases in accordance with the modification. During the hearing he offered to prove that he had increased wages but the Impartial Chairman refused to receive the offered evidence. The modified agreement entered into by the association as the authorized representative of its members was just as binding as any other provision of the agreement. There was no basis in the agreement for the demand by the union that Leon pay a higher wage scale than the one agreed to by the association and the union. Since there was an existing, enforceable contract with respect to wages the union could not, through the Impartial Chairman or otherwise, create some new and different obligation with respect to the wages Leon should pay.

Since the association was the exclusive bargaining representative of its members with respect to increases of wages, the Impartial Chairman would have authority only in case the association and the union failed to agree. Since they did not fail to agree on wage increases he had no authority in the matter.

The Impartial Chairman held a second hearing December 1, 1953, following a charge by the union that Leon had not complied with the first award. December 2, after the second hearing, the Impartial Chairman issued another award ordering compliance with the award of increased wages retroactive to July 1, 1953. This purported second award provided that if the entire sum were not paid within three days "then the Union, in addition to any other remedies it may have under the collective bargaining agreement between the parties, shall have full freedom to act as it, in its judgment, deems meet and proper under the circumstances." There was a provision in the agreement that during the term thereof "there shall be no general lockout, general strike, individual shop lockout, individual shop strike, or shop stoppage for any reason or cause whatsoever" and this provision applied while any complaint or grievance was being adjusted. As stated in the briefs and in oral argument, the avowed purpose of the union in taking the matter to the Impartial Chairman a second time was to procure from him a declaration that Leon in some manner had breached the contract, had forfeited all rights under it, and had thus relieved the union of its duty not to call a strike. The Impartial Chairman did not determine that Leon had violated the agreement but only that he had failed to comply with the award of November 20. This second proceeding was one for which no authority was to be found in the agreement. The purported award of December 2 was a nullity. Both awards were properly vacated by the court.

Leon was awarded costs by the judgment. He filed a memorandum of costs and disbursements in a total amount of $607.10. Included was an item of $586.60 for reporter's transcript of the proceedings before the Impartial Chairman. Upon motion to tax costs this item was stricken, leaving costs assessed at $20.50. Leon has appealed.

Sections of the Code of Civil Procedure treating of arbitration (§§ 1280-1293) contain no provisions respecting costs. However, the sections relating to arbitration are contained in part 3, title 9 of the Code of Civil Procedure, part 3

being devoted to special proceedings. Section 1032 of the Code of Civil Procedure provides that costs may be awarded to a successful plaintiff in certain actions and also in special proceedings and in the same situation a defendant upon a judgment in his favor is entitled to costs as of course. Section 1032 does not specify the costs that are allowable. Section 1033 requires that a party claiming costs shall verify his memorandum of costs stating that to the best of his knowledge and belief the items are correct and that the disbursements have been necessarily incurred in the action or proceeding. The cost of depositions is allowed unless the court shall determine that their taking was unnecessary (§ 1032-a). The question was whether the cost of the reporter's transcript was necessarily incurred by Leon for the purpose of presenting to the court his grounds for seeking annulment of the awards. We note that the order taxing costs was made by a judge other than the one who rendered the judgment. It would seem that the latter was in a better position to know whether the cost of the reporter's transcript was necessarily incurred. However, the affidavits created an issue as to the reasonable necessity for the use of the reporter's transcript in the court proceeding and the implied finding of the court was that its use was not necessary. It may be that the trial court concluded, as we have concluded, that the Impartial Chairman had no authority to act in the matter at all and that it was unnecessary for Leon to produce any evidence as to the proceedings that took place during the hearings. We have not found it necessary to look beyond the contract in determining that the proceedings were unauthorized. On the other hand Leon contended in court that the Impartial Chairman was guilty of misconduct in the exclusion of evidence that was offered and of other arbitrary action. In asserting these grounds counsel for Leon no doubt in good faith believed that a reporter's transcript would be necessary. ■ ■ It is well settled that where a claim is made for a disbursement the necessity for which is doubtful, and the item is properly challenged by motion to tax costs, the burden is on the claimant to establish necessity for the disbursement; its allowance is within the discretion of the trial court and if no abuse of discretion is shown the action of the trial court will not be disturbed. (*Barnhart* v. *Kron,* 88 Cal. 447 [26 P. 210]; *Miller* v. *Highland Ditch Co.,* 91 Cal. 103 [27 P. 536]; *Puppo* v. *Larosa,* 194 Cal. 721 [230 P. 440]; *Blair* v. *Brownstone Oil & Refining Co.,* 20 Cal.App.

316 [128 P. 1022] ; *Murphy* v. *F. D. Cornell Co.*, 110 Cal. App. 452, 455 [294 P. 490] ; *City of Los Angeles* v. *Abbott*, 129 Cal.App. 144, 153 [18 P.2d 785] ; *Estate of Bauer*, 59 Cal.App.2d 161 [138 P.2d 721].)

There was no agreement that the proceedings should be reported at the joint expense of the parties. They were reported solely for Leon's use in court in the event the award was one which he would seek to have vacated. Since the item was disallowed we do not have the question whether the court could properly have determined that it was a necessary disbursement and chargeable as such. ▮ It is clear that a party to an arbitration who has the proceedings reported for his exclusive use in court, and prevails there, cannot claim reimbursement as of course. It follows that it was not an abuse of discretion to disallow the item.

The judgment and the order are affirmed; Leon to recover costs on the appeal from the judgment; Stenzor to recover costs on the appeal from the order.

Wood, (Parker), J., and Vallée, J., concurred.