[Civ. No. 25532. Second Dist., Div. Two. May 2, 1962.]

THE PEOPLE ex rel. STANLEY MOSK, as Attorney General, Plaintiff and Appellant, v. JACK BARENFELD et al., Defendants and Respondents.

Stanley Mosk, Attorney General, Victor Griffith and Gerald F. Carreras, Deputy Attorneys General, for Plaintiff and Appellant.

Ball, Hunt & Hart and Joseph A. Ball for Defendants and Respondents.

ASHBURN, J.—The state appeals from a judgment for defendants Jack Barenfeld, Irving J. Leff and Maurice H. Friedman, in an action brought by it to recover all rents paid as lessee plus the purchase price paid by it for 836-846 Santee Street, Los Angeles; it made no restoration of benefits received, offered none and insisted on retaining the benefit of occupancy without payment of any compensation from about June 22, 1949 (date of lease) to July 1, 1952, under a lease prescribing rental of $346,469.85 for that period; also to recover the sum of $900,000 purchase price paid for the property on the last-mentioned date while retaining title to the premises so obtained. Quoting the findings: "[P]laintiff refused to claim damages for fraud or undue influence and plaintiff refused to pursue a remedy of damages for fraud or undue influence, and plaintiff elected to claim a forfeiture of all sums allegedly paid by plaintiff to defendants as alleged and prayed in said Third Amended Complaint." As to rescission and amendment of the complaint the court said at the trial: "[T]he State is according to the theory of the pleadings entitled to keep the building, recover back the entire purchase price paid for the building, and to recover back all of the payments made under the lease, which the Court, it appears to me to constitute a complete forfeiture of everything. I know of no such action cognizable under State law.

"We have discussed at length alternative theories that possibly could be supported under the pleadings, and I have been informed that there never has been an offer to restore the building. So, if the State at this time is in the position of an ordinary litigant before the Court, and for the alleged fraud perpetrated would be entitled to rescind or keep their bargain and sue for damages, an action for rescission would not be maintained because the requirements of the law with respect to rescissions have not been complied with so that the pleading could not be amended to show that you offered to restore it where the pleadings could be construed as being sufficient to state a cause of action for damages for fraud.

"As to the lease provisions, the Statute of Limitations has run on such fraud, and in the absence of allegations of discovery, time of discovery, circumstances of the discovery, and reasons why if any it was not sooner discovered, the Court has offered the Attorney General the opportunity of amending the pleadings to plead such discovery. The offer has been declined, as I understand it, on the grounds that it is the desire of the State through the Attorney General to proceed on the theory of forfeiture, if that is a proper designation of the cause of action as shown, that is shown by the pleadings."

Plaintiff's third amended complaint alleges that the Department of Finance is the agency of the state having the duty of advising and approving or disapproving of purchase or leasing by the state and conducting negotiations to such end. Somo Corporation was the owner of the Santee property which had a fair market value of $312,500 and no more; "(a) That during the period of time covered by the allegations of this complaint, the defendants did combine, confederate and conspire among and between themselves and other persons unknown to plaintiff and this relator to defraud the People of the State of California by creating an artificial and inflated value for said real property in the manner hereinafter set forth and thereafter selling said real property to the State of California for a price commensurate with the artificial and inflated value so created. (b) That the actions hereinafter alleged to have been taken by the defendants *were all taken pursuant and in furtherance of said conspiracy* and for the purpose of accomplishing its objective." (Emphasis added.) Defendants learned that the State Department of Education was interested in acquiring property [a new location for its Workshop for the Blind in Los Angeles] ; they conferred with officials of the Department of Finance and the Department of Education about the purchase of the Santee property. About January 1949, defendants secured from Somo an option to buy the property for $312,500, but this was done after defendants had persuaded the Department of Finance and the Department of Education to have the state lease it for 10 years for an aggregate rental of $1,119,-325.20; that "it was provided in said lease that the terms thereof were to be considered in fixing the purchase price of said property in the event that the State of California should ever decide to acquire the same." The lease obligated defendants to expend $237,000 for improvements on the property and this they did. After execution of the lease and before

acquiring title to the property defendants obtained from Mutual Benefit Life Insurance Company a firm commitment for a loan of $600,000, to be secured by mortgage or trust deed on the property and assignment of said lease. Defendants purchased the property for $312,500 from the proceeds of the loan, leaving them approximately $288,000 out of which to make the improvements and have $50,500 left over. The state paid defendants a total of $346,469.85 as rental and purchased the property from them on July 1, 1952, for $900,000. ''(a) That during the period between January 1, 1949, and July 1, 1952, and in furtherance of the conspiracy hereinbefore set out and for the purpose of influencing the judgment of the officers and employees of the State of California hereinafter referred to, whose judgment was to be exercised in the transactions referred to in this complaint, the defendants expended large sums of money in making gifts to and for lavish entertainment of the officers and employees of the State of California who had the duty to negotiate, scrutinize, approve or reject transactions looking to the acquisition or leasing of real property by the State of California and the defendants during said period and in furtherance of said conspiracy employed lobbyists all for the purpose of influencing the judgment and action of said officers and employees concerning the transactions referred to in this complaint. (b) . . . [T]hat the defendants spent approximately $10,000 in making gifts to and providing entertainment for employees of the State of California for the purpose of influencing the judgment of said employees of the State of California who were charged with the duty of advising the agencies of the state in the leasing and purchasing of the real property herein referred to. (c) That the books and records of the defendants disclose the expenditure of said sum for said purposes, but do not disclose the name or identities of the recipients of the gifts or entertainment, and the defendants have refused to disclose to plaintiff and relator the names or identity of such recipients. (d) That by reason of the foregoing activity of the defendants, the action of the officers and employees of the State of California in approving the execution of said lease *and the purchase of said real property* was not the result of the exercise of their own individual judgment and volition, but was the result of the improper influence, direction, control and solicitation of the defendants, all of whom had a pecuniary interest in the effectuation of said transactions. [Emphasis added.] (e) That by reason of the foregoing activity of the

defendants, *there was no bargaining at arms-length* between the officers and employees of the State of California on the one hand, and the defendants on the other hand. For said reasons, as well as for all of the reasons set forth in this complaint, *all of said transactions were contrary to public policy, illegal, and void."* (Emphasis added.)

There is no room for doubt that this complaint shows a transaction between defendants and agents of the state which is contrary to public policy and to be condemned by all right-thinking persons.[1]

 *County of San Bernardino* v. *Gate City Creamery Co.,* 103 Cal.App. 367, 373 [284 P. 457] : "It will be conceded that any influence brought to bear upon a public board or official which has the evil tendency to influence such officer or board in the discharge of its public duty by trammeling the judgment in matters about which these public representatives should be left free to act as the public interests alone may dictate or require, is against public policy, and if such vitiating element is present and has that tendency in the eyes of the law, it makes no difference what the actual motive of the public officials in the particular instance may be."

 *Terry* v. *Bender,* 143 Cal.App.2d 198, 206 [300 P.2d 119] : "Since the officers of a governmental body are trustees of the public weal, they may not exploit or prostitute their official position for their private benefits. When public officials are influenced in the performance of their public duties by base and improper considerations of personal advantage, they violate their oath of office and vitiate the trust reposed in them, and the public is injured by being deprived of their loyal and honest services. It is therefore the general policy of this state that public officers shall not have a personal interest in any contract made in their official capacity. . . .

 A transaction in which the prohibited interest of a public officer appears is held void both as repugnant to the public policy expressed in the statutes and because the interest of the officer interferes with the unfettered discharge of his duty to the public. The public officer's interest need not be a direct one, since the purpose of the statutes is also to remove all indirect influence of an interested officer as well as to discourage deliberate dishonesty."

*People* v. *Harby,* 51 Cal.App.2d 759, 773 [125 P.2d 874]

---

[1] As plaintiff never got into its proof upon the facts, we confine our remarks to the averments of the complaint; we know nothing about their truth or falsity.

(per the late Mr. Presiding Justice Moore) : "That a public office is a public trust is a universal truism. No trustee thereof may with impunity exploit its prerogatives, embezzle its properties, or appropriate its funds. Should he do so, he is answerable to the wrath of the sovereign beneficiary to the extent of the utmost farthing. Every state or municipal office is a sanctuary whereat not only should keep vigil the constituted guardians of the public store-house but wherein should toil the standard-bearers of public virtue. An incumbent defiles himself and desecrates his office as would the priest at the altar when he plunders the wealth or usurps the privileges under his watch-care. The rights of the owner of property are instinctively comprehended by every normal person. No cloak of office should so dull his conscience or his sense of values as to render an official untrustworthy when unguarded. He should delight in the unfailing consciousness that he has performed tasks not legally required of him and that he has contributed his own substance for the common good rather than to have been the stealthy profiter from the public bounty. Unless this standard be the pole-star of those who serve the state, we may envisage the day when the trailing vines and clinging mosses will cover the tomb of a once proud civilization."

It is not claimed by plaintiff that the case falls within section 1090, Government Code.[2]

In addition to denials of the material allegations of the complaint defendants alleged by way of affirmative defense that the premises were condemned by the state in a certain proceeding entitled *The State of California, etc., Plaintiff* v. *Maurice H. Friedman, et al., Defendants, No. 598927,* in the Superior Court of Los Angeles County, in which judgment was entered on or about July 1, 1952; that this was done pursuant to a written stipulation "that the said Court should enter its decree of condemnation and setting the amount of $900,000 as payment thereof, and [the Attorney General] did thereafter prepare and present to the Court and obtain the issuance by the Court of the judgment in said amount"; that plaintiff herein is barred and estopped thereby.

---

[2] Gov. Code, § 1090: "Members of the Legislature, state, county, judicial district, and city officers shall not be interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, judicial district, and city officers be purchasers at any sale or vendors at any purchase made by them in their official capacity."

One procedural aspect of the trial calls for comment. The trial judge held that the third amended complaint does not state a cause of action but also granted a motion of defendants made under section 597, Code of Civil Procedure, for trial of the issue of res judicata before other issues. The court sustained their objections to introduction of evidence in support of the complaint but further decided, through a commendable desire to make a complete disposition of the cause, to base its judgment upon the defense of res judicata as well as insufficiency of the complaint. Evidence in support of the complaint was rejected though tendered in opposition to affirmative proof received upon defendants' plea of res judicata.[3] The court found that "the validity and value of the Lease dated June 22, 1949 . . . and any damages which might have accrued to Jack Barenfeld, Maurice Friedman and Irving Leff by reason of the cancellation and termination of said Lease through eminent domain, were issues presented by pleadings in said action in eminent domain. . . ." and

---

[3] "MR. BALL: . . . We have no further evidence to offer on this special issue. MR. CARRERAS: Your Honor, as to the special defense of res judicata, we would make an offer of proof in countervention thereof as to the elements contained in our Complaint which you have heretofore held does not contain facts sufficient to constitute a cause of action. THE COURT: All right. MR. CARRERAS: We will offer to prove the contents of the Complaint, your Honor, in opposition to the special defense presented by the Defendants. THE COURT: Anything further? MR. CARRERAS: No, sir. MR. BALL: Objected to as being immaterial to this issue. THE COURT: The contents of your Complaint allege that you purchased this property, period. You do not claim that you just put out and purchased it in open market transaction, do you? MR. CARRERAS: No, sir. I meant as to the issue which has been raised, the Plaintiff would seek to meet that defense by proving the allegations of the Complaint. THE COURT: You mean with respect to the giving of gratuities? MR. CARRERAS: Yes, sir. All that is contained in the Complaint. . . ."

"MR. GRIFFITH: Well, your Honor, for the purposes of this defense, I presume that the Court will consider evidence in the Complaint of the present case, that is, Barenfeld, the Third Amended Complaint. Because there is now in evidence the Complaint in eminent domain, and we would submit the Complaint in *People* versus *Barenfeld* and enable the Court to determine the applicability of res judicata. THE COURT: Well, of course, the allegations of your Complaint are inconsistent with the defense here presented in that, I think it is Paragraph XI, to purchase the property; to say nothing about the eminent domain proceedings. MR. GRIFFITH: We would stipulate, your Honor, or offer to stipulate that with reference to the allegations in Paragraph IX, that the allegations therein do refer to the acquisition on July 1, 1952 by the State of California of the subject property by condemnation proceedings, namely, the proceedings that have been introduced in evidence, the judgment roll of the prior proceedings. . . ."

"THE COURT: Well, I am just wondering whether or not the judgment may not be predicated upon the insufficiency of the pleadings as a matter of law to state a cause of action, with the further finding and

that said judgment constitutes a bar and estoppel with respect to the issues in the instant case. This presupposes an examination of the complaint and defendants, having obtained a ruling that precluded any evidence in its support (the equivalent of sustaining a general demurrer), cannot be heard to say here that those allegations are untrue in any respect. (*Lunsford* v. *Kosanke*, 140 Cal.App.2d 623, 628 [295 P.2d 432] ; *Stockwell* v. *McAlvay*, 10 Cal.2d 368, 372 [74 P.2d 504] ; *Corona Investment Co.* v. *Riedman*, 11 Cal.App.2d 648, 649-650 [54 P.2d 85] ; *United Bank & Trust Co.* v. *Hunt*, 1 Cal.2d 340, 345 [34 P.2d 1001].) In other words, the correctness of the finding on res judicata must be tested by the complaint and upon the assumption that its allegations are true. First we discuss the propriety of the sustaining of the plea of res judicata.

We would experience little difficulty in finding for defendants upon the following propositions—that the party to each action is the same, the State of California, not its agents who invoked the processes of the court; that the condemnation case necessarily presented the issue of the value of the state's existing leasehold upon defendants' land and that that issue turned upon the validity or invalidity of the lease; that a void lease is worthless and a voidable one worth little more; that a stipulated judgment generally has the same quality of conclusiveness as does a contested one. (*Rogers* v. *Springfield Fire & Marine Ins. Co.*, 92 Cal.App. 537 [268 P. 679] ; *Nielsen* v. *Emerson*, 119 Cal.App. 214 [6 P.2d 281] ; *FitzGerald* v. *Terminal Development Co.*, 11 Cal.App.2d 126 [53 P.2d 177, 55 P.2d 194] ; *Guaranty L. Corp.* v. *Board of Supervisors*, 22 Cal.App.2d 684 [71 P.2d 931].) But we can follow respondents no further along this line.

Defendants' proofs (principally the judgment roll in the eminent domain case) show that the complaint in that proceeding was filed on May 5, 1952; no answer was filed by any defendant; a stipulation dated June 5, 1952, was filed on June 24, 1952, which expressly constitutes a general appearance;

judgment that any issues raised by the Complaint relating to the validity or invalidity of the lease referred to were adjudicated in the eminent domain proceeding, and are barred from further litigation or adjudication by the judgment in the eminent domain proceeding. . . .''

''And it is the judgment of the Court—well, the Court has announced with respect to the sustaining of the objection to the introduction of any evidence. And the Court further finds that the cause of action attacking the validity of the lease is barred by the judgment in the condemnation suit; that that judgment is res judicata, until it is set aside on the grounds of extrinsic fraud. . . .''

it further says: "The undersigned as such defendants, hereby waive trial, findings of fact and conclusions of law, notice of entry of judgment, and notice of entry of final order and decree of condemnation and hereby stipulate that a judgment in the words and figures of the form of judgment attached hereto, which is hereby incorporated herein and made a part of this Stipulation, may be forthwith signed and entered in the above entitled proceeding." Attached is a form of judgment (later signed and entered) which awards $900,000 for the taking of all interests in the property; orders payment to Mutual Benefit Life Insurance Company of $456,453.23, plus a bonus of $12,000, plus interest, and orders reconveyance of trust deed by said company and Title Insurance and Trust Company; it further orders that upon recording of final decree the lease "shall be deemed cancelled, terminated and of no further force and effect." It thus appears that there never was any issue raised or to be tried in the case.

The situation is controlled by *Miller & Lux Inc.* v. *James,* 180 Cal. 38 [179 P. 174] (cited and quoted by appellant), rather than the cases above cited. ▮ The court there said, at page 44: "The rule of *res adjudicata* is to prevent vexatious litigation and to require the parties to rest upon one decision in their controversy, but where they expressly agreed to withdraw an issue from the court, the reason for the rule ceases. ▮ The issue is not in fact adjudged, and the parties themselves having consented to that method of trial are not entitled to invoke the rule which requires parties to submit their whole case to the court. If they consent to adjudicate their differences piecemeal, there is no reason that the court should extend the rules of law to prevent that which they had expressly agreed might be done." At page 46: "Taken as a whole, therefore, the stipulation was in fact a withdrawal of an issue from the consideration of the court. The reservations and provisos in favor of the parties neither add to nor detract from this fundamental fact, and the issue having thus been withdrawn by consent, the decision of the court cannot be held to be an adjudication upon the very issue so withdrawn." Accord: *Loup County* v. *Rumbaugh,* 151 Neb. 563 [38 N.W.2d 745, 754]; *Warren* v. *Stanton County,* 145 Neb. 220 [15 N.W.2d 757, 764]; *Abarr* v. *United States,* 153 F.Supp. 387, 388; *United States* v. *International Bldg. Co.,* 345 U.S. 502, 506 [73 S.Ct. 807, 97 L.Ed. 1182]; 2 A.L.R.2d 514, Note at page 539. ▮ The above-cited cases which state that a stipulated judgment has the same conclusiveness

as a contested one presuppose the continued existence of issues at the time the stipulation is made, not their withdrawal from the case. Moreover, a stipulated judgment is always vulnerable upon the ground of collusion (*Moore* v. *Schneider*, 196 Cal. 380, 389 [238 P. 81]; *Warren* v. *Stanton County* (Neb.), *supra*, 15 N.W.2d 757, 764; *Loup County* v. *Rumbaugh* (Neb.), *supra*, 38 N.W.2d 745, 754; *People* ex rel. *Oliver* v. *Knopf*, 198 Ill. 340 [64 N.E. 842, 848]), and that is the case shown by the complaint at bar, assumed to be true.[4]

We conclude that the plea of res judicata was erroneously sustained. But that does not dispose of the case.

 Plaintiff's complaint proceeds upon a claimed right of forfeiture, nothing less, and that position has been maintained throughout the trial and in this court. There is no statute so providing and the courts have no power to create and enforce a forfeiture where there is no underlying legislative authorization. (*Harbor Comrs.* v. *Excelsior Redwood Co.*, 88 Cal. 491, 493 [26 P. 375, 22 Am.St.Rep. 321]; *United States* v. *Charles D. Kaier Co.* (3 Cir.) 61 F.2d 160, 162; 37 C.J.S. § 3, p. 6; see also *City Lincoln-Mercury Co.* v. *Lindsey*, 52 Cal.2d 267, 276 [339 P.2d 851]; *General Motors Accept. Corp.* v. *Kyle*, 54 Cal.2d 101, 111 [4 Cal.Rptr. 496, 351 P.2d 768].) The trial judge designated plaintiff's objective as forfeiture and the deputy attorney general trying the case did not question that characterization, but we need not rest upon mere semantics.

 The state has proceeded upon an unsound theory and has asserted it so tenaciously that in the process it has discarded appropriate available remedies—damages or rescission. It refuses to do equity and insists on a right to enjoy occupancy worth $346,000 without payment therefor and to recover the $900,000 purchase price of property while clinging to possession and title to the property. This position overlooks a fundamental principle applicable to the sovereign as litigant.

---

[4]The claim made at oral argument that the judgment cannot be collaterally attacked cannot prevail here, for the collusive nature of the judgment is affirmatively shown by the complaint in paragraph X (d) and (e). The present record is of equal dignity with that of the condemnation proceeding and hence the rule of direct attack does not apply. See, *Thompson* v. *Cook*, 20 Cal.2d 564, 569-573 [127 P.2d 909]; *Estate of Ivory*, 37 Cal.App.2d 22, 29-31 [98 P.2d 761]; *Hill* v. *City Cab etc. Co.*, 79 Cal. 188, 191 [21 P. 728]; *People* v. *Harrison*, 107 Cal. 541, 545-546 [40 P. 956]; *Follette* v. *Pacific L. & P. Corp.*, 189 Cal. 193, 205 [208 P. 293, 23 A.L.R. 965]; *Akley* v. *Bassett*, 189 Cal. 625, 639 [209 P. 576]; *Garrison* v. *Blanchard*, 127 Cal.App. 616, 621 [16 P.2d 273].

 ''Generally speaking, when a state voluntarily places itself in the position of a suitor, whether in its own courts or in those of a sister state, it will be held to have laid aside its sovereignty and to have taken on the garb of an ordinary suitor, so far as concerns all proper matter of adjudication growing out of the cause sued on, and the defendant will be entitled to plead and prove any and all matters properly defensive. Hence, a state by bringing an equitable action opens the door to any defense or cross complaint germane to the matter in controversy.'' (49 Am.Jur. § 84, p. 297.) ''As a general rule, the state, when equitable relief is sought, must, like private individuals, bring itself within the known and fixed rules of equitable interference before the court will grant its petition.'' (49 Am.Jur. § 83, p. 297.) 3 McQuillin, Municipal Corporations (2d ed. rev.) section 1379, page 1357: ''It is well settled that where a municipality has received the benefits of a contract, equity will not cancel or set it aside in a suit by the municipality without compelling the municipality to do equity by restoring the benefits received thereunder.''

*City of Winter Haven* v. *State*, 125 Fla. 392 [170 So. 100, 108]: ''Even when the sovereign goes into one of its own courts as a party litigant and seeks the benefit of the use of one of the court's discretionary writs, it must do so subject to the settled law and rules governing the granting and enforcement of such writ. It has been said that the American citizen bows his knee to no earthly power save the law of the land; and even the state itself, at least as a litigant, is not superior to its own laws and to those well-settled principles of jurisprudence which govern the administration of justice according to law in its courts.'' (To the same effect, see *Grady* v. *City of Livingston*, 115 Mont. 47 [141 P.2d 346, 353-354]; *State* v. *Holgate*, 107 Minn. 71 [119 N.W. 792, 793]; *State* v. *Kilburn*, 81 Conn. 9 [69 A. 1028, 1030]; *State* ex rel. *Comrs. of Land Office* v. *Sparks*, 208 Okla. 150 [253 P.2d 1070, 1074]; *State* v. *Portsmouth Sav. Bank*, 106 Ind. 435 [7 N.E. 379, 380]; *State* v. *Bucholz*, 169 Minn. 226 [210 N.W. 1006, 1006-1007]; *State* v. *Schurz*, 143 Minn. 218 [173 N.W. 408, 409]; *Bouldin* v. *State*, 21 Ark. 84, 85; *State* v. *Arkansas Brick & Mfg. Co.*, 98 Ark. 125 [135 S.W. 843, 844, 33 L.R.A. N.S. 376]; *Rice* v. *Dickson Car Wheel Co.* (Tex.Civ.App.) 65 S.W. 645; *Howard* v. *Cook*, 59 Idaho 391 [83 P.2d 208, 211]; *Anderson, Clayton & Co.* v. *State*, 122 Tex. 530 [62 S.W.2d 107, 110]; *People* v. *Sound View Land & Improve-*

*ment Co.*, 239 App. Div. 201 [267 N.Y.S. 294, 296] ; 81 C.J.S. § 217, p. 1322; § 220, p. 1325; 49 Am.Jur. § 84, p. 297.)

This basic requirement of governmental honesty has been recognized in this State in procedural matters (*Superior Oil Co.* v. *Superior Court*, 6 Cal.2d 113, 118-119 [56 P.2d 950] ; *Bank of America* v. *Superior Court*, 84 Cal.App.2d 34, 35 [189 P.2d 799] ; *Estate of Thatcher*, 120 Cal.App.2d 811, 814 [262 P.2d 337] ; *Bayle-Lacoste & Co.* v. *Superior Court*, 46 Cal.App.2d 636, 640 [116 P.2d 458]), but our courts have not confined the doctrine to the mere adjective aspects of a cause. In *Farrell* v. *County of Placer*, 23 Cal.2d 624, 627, 628 [149 P.2d 570, 153 A.L.R. 323], it is said: "It has been said generally that a governmental agency may not be estopped by the conduct of its officers or employees (10 Cal.Jur. 650-651), but there are many instances in which an equitable estoppel in fact will run against the government where justice and right require it. . . . It has been aptly said: 'If we say with Mr. Justice Holmes, ''Men must turn square corners when they deal with the Government,'' It is hard to see why the government should not be held to a like standard of rectangular rectitude when dealing with its citizens.' (48 Harv. L.Rev. 1299.)'' (See also *City of Los Angeles* v. *Borax Consolidated* (9 Cir.) 102 F.2d 52, 56-58 (cert. den. 307 U.S. 644 [59 S.Ct. 1042, 83 L.Ed. 1524]) ; *County of Sacramento* v. *Southern Pac. Co.*, 127 Cal. 217, 222-225 [59 P. 568, 825].) The sovereign not only is subject to the plea of estoppel in a proper case but must also affirmatively do equity when it invokes the jurisdiction of a court of equity. Counsel for plaintiff conceded at the trial that "basically, we are in a court of equity"; "We have been into the equity side, appealing to the equity side of the Court."

Counsel's reliance upon *Pan American Petroleum & Transp. Co.* v. *United States*, 273 U.S. 456 [47 S.Ct. 416, 71 L.Ed. 734] ; *Mammoth Oil Co.* v. *United States*, 275 U.S. 13 [48 S.Ct. 1, 72 L.Ed. 137], and *Driscoll* v. *Burlington-Bristol Bridge Co.*, 8 N.J. 433 [86 A.2d 201], finds little justification in those decisions. The *Pan American* and *Mammoth Oil* cases grew out of the Teapot Dome scandal. At the suit of the government contracts and leases obtained through collusion with Secretary Fall and his subordinates were invalidated and defendants denied any offsetting compensation for improvements made upon the property. It is to be noted, however, that the government had not leased or purchased any land from defendants; the reverse was true. Secondly, the de-

cisions were bottomed upon the consideration that the deals were designed to circumvent specific and applicable federal statutes; there is no such factor in the case at bar. So far as unjust enrichment was concerned it appeared that the contract specifically provided for the making of the improvements for which defendants sought compensation and that allowing same would enable the wrongdoers to enjoy a part of the fruits of their unlawful transaction. In the *Pan American* case it is said: "The United States does not stand on the same footing as an individual in a suit to annul a deed or lease obtained from him by fraud. Its position is not that of a mere seller or lessor of land. The financial element in the transaction is not the sole or principal thing involved. This suit was brought to vindicate the policy of the government, to preserve the integrity of the petroleum reserves and to devote them to the purposes for which they were created. The petitioners stand as wrongdoers, and no equity arises in their favor to prevent granting the relief sought by the United States. They may not insist on payment of the cost to them or the value to the government of the improvements made or fuel oil furnished, as all were done without authority and as means to circumvent the law and wrongfully to obtain the leases in question. As Congress had not authorized them, it must be assumed that the United States did not want the improvements made or was not ready to bear the cost of making them. . . . Whatever their usefulness or value, it is not for the courts to decide whether any of these things are needed or should be retained or used by the United States. Such questions are for the determination of Congress. It would be unjust to require the United States to account for them until Congress acts; and petitioners must abide its judgment in respect to the compensation, if any, to be made." (Pp. 509-510.) In *Mammoth*: "The tanks, pipe line and other improvements put upon the reserve for the purpose of taking away its products were not authorized by Congress. The lease and supplemental agreement were fraudulently made to circumvent the law and to defeat public policy. No equity arises in favor of the lessee or the other petitioners to prevent or condition the granting of the relief directed by the Circuit Court of Appeals. Petitioners are bound to restore title and possession of the reserve to the United States, and must abide the judgment of Congress as to the use or removal of the improvements or other relief claimed by them." (P. 55.)

The *Driscoll* case was an action brought by the Governor

and the Attorney General of New Jersey to rescind a contract for purchase of two toll bridges which had been built by private corporations. The defendants had purchased the stock of the two bridge corporations and sold the bridges to Burlington County at a large profit to themselves. At page 221 [86 A.2d] the court said: "The facts as herein summarized clearly prove that the acquisition of the bridges by the bridge commission was fraught with fraud and corruption. . . . We are in complete accord with the determination of the trial court that the purchase of the bridges was accomplished in a manner plainly contrary to public policy and therefore illegally." Concerning a claim for restitution the court said, at page 234 [86 A.2d]: "The members of the selling syndicate must make restitution of that which they have received, for otherwise they will be unjustly enriched by their fraud at the expense of the public. They and their nominees are therefore liable to repay the $3,050,347 gross profit which they received for their stock as the result of this transaction and they are not entitled to any credit for the expenses incurred in effectuating the fraudulent scheme, for none of those expenses can rightly be said to have been of benefit to the bridge commission or the public it represents."

Only indirectly do the foregoing cases bear upon the situation at bar wherein the state was lessee and then purchaser of defendants' property, insisting upon retaining all that it got from defendants and recovering back all it had paid for the same. No case has been cited which authorizes this even when the sovereign complains, and our own research has disclosed no such holding.

We are aware of authorities that say estoppel will not run against the state; that a contract which is contrary to public policy is void, not merely voidable (17 C.J.S., § 211, p. 563), and that rescission and restoration of benefits are not necessary to recover what has been paid under such a void contract (12 Cal.Jur.2d, § 201, p. 419; 17 C.J.S., § 413, p. 899). But as we shall show, they are not applicable here. ■ Estoppel will run against the state where justice and right require it. (See *Farrell* v. *County of Placer, supra,* 23 Cal.2d 624, 627-628; *County of Sacramento* v. *Southern Pac. Co., supra,* 127 Cal. 217, 222-225; 44 Cal.L.Rev. 340-351.)

■ A contract which is contrary to public policy is not always void nor is it universally true that it cannot be the subject of rescission. That is especially true in this State. Section 1667, Civil Code, says: "That is not lawful which is:

. . . 2. Contrary to the policy of express law, though not expressly prohibited; . . .'' Section 3406, Civil Code: ''The rescission of a contract may be adjudged, on the application of a party aggrieved: 1. In any of the cases mentioned in section [1689]; or, 2. Where the contract is unlawful, for causes which do not appear in its terms or conditions, and the parties were not equally in fault; or, 3. When the public interest will be prejudiced by permitting it to stand.'' Section 3408, Civil Code: ''On adjudging the rescission of a contract, the court may require the party to whom such relief is granted to make any compensation to the other which justice may require.'' (These sections were enacted in 1872 and §§ 3406 and 3408 were transferred in 1961 to §§ 1689 and 1691, Civil Code.) Plainly, the statute recognizes the propriety of rescission and restitution of a contract whose unlawfulness lies in contravention of public policy. This ''unruly horse'' known as public policy has not been harnessed into any rigid pattern of unvarying conduct. A contract infected with this vice may or may not be treated as void, according to circumstances, and rescission with restoration of benefits may be granted or withheld as equity requires.

Volume 5, Williston on Contracts (rev. ed.), section 1632, page 4575: ''It may be observed here also that even a guilty party, if not thought to be in *pari delicto,* and if public policy demands it, even an equal participant in the illegality is often allowed relief by way of restitution or rescission, though not on the contract.'' Volume 6, *id.,* section 1762, page 5002: ''But it should be noted that an executed illegal transaction though based on an unenforceable bargain is in general effectual between the parties. In some instances, however, a sound public policy may demand either the enforcement of an executory illegal bargain, or the rescission of an executed one, when a denial of such relief by the courts would work a forfeiture disproportionate to the social interest supporting the public policy, or result in harm to those for whose protection such bargains are declared illegal.'' Section 1787, pages 5080-5081: ''To the general rule that an executed transfer cannot be set aside, there are, however, exceptions which may be included either under the head of an unexecuted illegal purpose or of parties not *in pari delicto.* Occasionally, there may also be cases where, in spite of both parties sharing in the illegality of an executed transaction, public policy will be best served by rescission, even though the result is to permit recovery by a guilty plaintiff; for example, if failure to rescind will affect

not only the parties to the transaction but will injure the public.'' Volume 17, Corpus Juris Secundum, section 272, page 660: *"When public a party.* The ordinary rule governing individuals, that when a contract against public policy is executed the law will leave the parties where it finds them, does not apply where the public is one of the parties." Volume 17, Corpus Juris Secundum, section 278, page 665: *"Where public policy requires its intervention, the court may grant relief to a party to an illegal agreement.* Although the parties are in pari delicto, yet the court may interfere and grant relief at the suit of one of them, where public policy requires its intervention, even though the result may be that a benefit will be derived by a plaintiff who is in equal guilt with defendant; but here the guilt of the parties is not considered as equal to the higher right of the public, and the guilty party to whom the relief is granted is simply the instrument by which the public is served." Volume 12 Corpus Juris Secundum, section 46, page 1018: ''The rule that when parties are in pari delicto the court will lend its aid to neither is subject to certain exceptions. Thus, where the public interest requires its intervention, relief will be granted, although the result may be that the property will be restored to, or a benefit derived by, a plaintiff who is in guilt equal with defendant.''

We conclude that there was no impediment to a rescission of the instant contracts by the state or to a restoration by it of the benefits received from defendant wrongdoers. In this respect the state is on a parity with a private suitor in the case at bar and its failure to rescind and restore or offer to restore precludes it from recovering from defendants any of the moneys paid out by the state. The court correctly held that the third amended complaint does not state a cause of action. In the circumstances shown by the record it was not and is not susceptible to amendment.

In view of the foregoing conclusions there is no necessity of discussing the matter of the statute of limitations or other arguments presented by counsel upon the appeal from the judgment.

Whether the state has any remaining remedy is not before us and hence is not determined herein.

Plaintiff also appeals from order denying its motion to tax costs by disallowing the following item: "Photocopies of exhibits to depositions $281.43."

Section 1032a, Code of Civil Procedure, provides: "Any person allowed his costs under the provisions of this chapter

shall, in addition to other costs, be entitled to the reasonable cost of taking and transcribing depositions, together with the reasonable cost of one copy of each such deposition, unless it shall appear to the court that the taking of such deposition was unnecessary, and in addition the reasonable cost of one copy of all depositions taken by the party or parties against whom such costs are allowed.'' It appears that plaintiff and defendants took 13 depositions, during which plaintiff caused to be marked for identification numerous exhibits, including letters, memoranda and reports taken from the files of the State Department of Finance and the Department of Public Works. Declaration of Donald B. Caffray, defendants' attorney, submitted in opposition to motion to tax, says: ''At the time of the taking of the depositions, the originals of the exhibits used were not attached to the depositions, but, for convenience, were retained, pursuant to stipulated agreement of the parties, in the files of the Attorney General's office. This was for the purpose of facilitating the Attorney General's office in the taking of further depositions, where that office intended to use the same exhibits again, and for the purpose of aiding them to read and understand the depositions already taken. It was thus essential for the defendants to make and have available copies of all such exhibits in order to read and understand the depositions taken.'' After the documents were photostated they were returned to the Attorney General. To all intents and purposes they became a part of the deposition (see 48 Cal.Jur.2d, § 102, p. 148).

It is apparent that the defendants, who were entitled to tax the reasonable cost of a copy of the depositions, could properly have insisted upon the documents being copied into the deposition or attached thereto so that the testimony of the witnesses and the effect of these potential exhibits could be used by defense attorneys in their preparation for trial and during the trial of this action involving a large amount of money. Instead, they cooperated with the Attorney General and procured photostats of the exhibits, which answered the full purpose of their being transcribed in the deposition. That the copies of the documents were not necessary to defendants' case is not claimed by plaintiff, nor is it suggested that the cost was excessive. The verified cost bill made a prima facie case of such necessity. (*Jeffers* v. *Screen Extras Guild, Inc.,* 134 Cal.App.2d 622, 623 [286 P.2d 30]; *Wilson* v. *Board of Retirement,* 176 Cal.App.2d 320, 323 [1 Cal.Rptr. 373]; *Meyer* v. *City of San Diego,* 132 Cal. 35, 36 [64 P. 124].)

"It is not practicable for the Legislature to foresee all the various items of costs that arise in litigation, and as said in *Bond* v. *United Railroads*, 20 Cal.App. 124, 129 [128 P. 786], 'Our supreme court has said that "the allowance or disallowance of items for expense and disbursements incurred upon the trial of the action must be left in nearly every instance to the discretion of the judge where the cause was tried" (*Miller* v. *Highland Ditch Co.*, 91 Cal. 103 [27 P. 536].)' " (*Maguire* v. *Corbett*, 119 Cal.App.2d 244, 252 [259 P.2d 507].)
▮▮▮ Where the question of necessity of the challenged item is debatable the allowance of same, as stated in *Stenzor* v. *Leon*, 130 Cal.App.2d 729, 735 [279 P.2d 802], "is within the discretion of the trial court and if no abuse of discretion is shown the action of the trial court will not be disturbed. (*Barnhart* v. *Kron*, 88 Cal. 447 [26 P. 210] ; *Miller* v. *Highland Ditch Co.*, 91 Cal. 103 [27 P. 536] ; *Puppo* v. *Larosa*, 194 Cal. 721 [230 P. 440] ; *Blair* v. *Brownstone Oil & Refining Co.*, 20 Cal.App. 316 [128 P. 1022] ; *Murphy* v. *F. D. Cornell Co.*, 110 Cal.App. 452, 455 [294 P. 490] ; *City of Los Angeles* v. *Abbott*, 129 Cal.App.2d 144, 153 [18 P.2d 785] ; *Estate of Bauer*, 59 Cal.App.2d 161 [138 P.2d 721].) "

It was held in *Hoge* v. *Lava Cap Gold Mining Corp.*, 55 Cal.App.2d 176, 187, 188 [130 P.2d 470], that traveling expenses of an attorney incurred in going to and from the place of a deposition taken by his opponent upon oral interrogatories was taxable; this was based upon the consideration that the court did not abuse its discretion in holding that the attorney's presence at the deposition was reasonably necessary and hence a proper item of taxable costs. ▮▮▮ We hold that the trial judge exercised a reasonable discretion in the present instance.

Judgment and order affirmed.

Fox, P. J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 27, 1962.