[Civ. No. 21155. First Dist., Div. Two. Feb. 17, 1964.]

CALIFORNIA WATER SERVICE COMPANY et al., Plaintiffs and Respondents, v. EDWARD SIDEBOTHAM & SON, INCORPORATED, Defendant and Appellant; CARSON ESTATE COMPANY et al., Defendants and Respondents.

[Civ. No. 21156. First Dist., Div. Two. Feb. 17, 1964]

CALIFORNIA WATER SERVICE COMPANY et al., Plaintiffs and Respondents, v. CITY OF HAWTHORNE et al., Defendants and Appellants; CARSON ESTATE COMPANY et al., Defendants and Respondents.

(Consolidated Cases.)

718

Clifton A. Hix, Elizabeth Hix, A. B. Keel, City Attorney (Hawthorne), Jennings, Engstrand & Henrikson, Paul D. Engstrand, Jr., and John P. Campbell for Defendants and Appellants.

McCutchen, Black, Harnagel & Shea, G. William Shea, Max K. Jamison, Stanley E. Remelmeyer, City Attorney (Torrance), Musick, Peeler & Garrett and David P. Evans for Plaintiffs and Respondents.

Cosgrove, Cramer, Rindge & Barnum, John N. Cramer, J. D. Barnum, Jr., Auten F. Bush, City Attorney (El Segundo) Frank E. Jenney, Walter N. Anderson, City Attorney (Manhattan Beach), Knapp, Gill, Hibbert & Stevens,

Joseph C. Gill, O'Melveny & Myers, Lauren M. Wright, Buford W. Max, William J. DeMartini, William D. Foote, Burris & Lagerlof and Stanley C. Lagerlof for Defendants and Respondents.

Bewley, Knoop, Lassleben & Whelan, Martin E. Whelan, Jr., and Edward L. Miller as Amici Curiae on behalf of Respondents in No. 21156.

TAYLOR, J. — By stipulation, consolidated appeals have been taken by two of the defendants in this action: the first [No. 21156] by the City of Hawthorne and Edward Sidebotham & Son, Inc. (hereafter referred to as Sidebotham) from a judgment determining the ground water rights of the parties; the second [No. 21155] by Sidebotham from an order denying its motions to vacate the judgment.

In 1945, the plaintiffs, the California Water Service and Palos Verdes Water Companies and the City of Torrance, three of the producers of water from a 101,000-acre alluvial filled basin of ground water in West Los Angeles County known as the West Coast Basin (hereafter referred to as basin), filed this action against the appellants and several hundred other defendants[1] to determine the ground water rights within the area and to enjoin an alleged annual overdraft in order to prevent eventual depletion of the supply and permanent injury by mineralization and salt water intrusion. Pursuant to section 2001 of the Water Code, the trial court referred the matter to the Division of Water Resources of the State Department of Public Works[2] for a determination of the facts and the ensuing reports of the division were received into evidence. On the basis of the first of these reports, the complaint was amended in 1949 to bring in several hundred additional parties and to allege that each of the defendants made a claim adverse to each of the plaintiffs and to all of the other defendants.

Subsequently, after additional reports, the parties owning more than 80 per cent of the prescriptive rights in the basin entered into an agreement and stipulation for judgment al-

---

[1]The original complaint listed over 500 named defendants, including the two appellants, and 180 fictitious defendants.

[2]In 1956, the functions of this division were transferred to two newly created agencies, the Department of Water Resources and the State Water Rights Board (Stats. 1957, 1st Ex. Sess. 1956, ch. 52, p. 421 et seq.).

locating the water, restricting total production, providing for an exchange pool arrangement, reserving jurisdiction and continuing supervision through the Department of Water Resources as Watermaster. The appellants did not sign the agreement. The matter was originally set for trial in 1956 but then continued to 1961 pending the completion of additional reports by the referee. The appellants were duly notified of all proceedings but did not appear. On August 22, 1961, the court rendered a judgment substantially enforcing the terms of the stipulation against all parties, including the appellants.

The principal issues presented on this appeal are whether the trial court properly limited the amount of water that the City of Hawthorne may take from the basin, and whether it erred in concluding that Sidebotham had waived the protection of section 286 of the Code of Civil Procedure. As entirely different contentions are raised by each of the appellants, we will discuss these issues separately.

### Hawthorne's Appeal

We turn first to the appeal of the City of Hawthorne, hereafter referred to as Hawthorne. As Hawthorne does not question the facts as found by the court below nor the sufficiency of the evidence to support the judgment, a brief summary of the findings and conclusions will suffice.

The court found the following facts: As early as 1920, the aggregate extractions of water of all producers from the basin exceeded the total annual replenishment. Since before 1932, there had been no waters in the basin available for appropriation. From 1932 to 1949, the average annual ground water replenishment was 24,400 acre feet while during the same period, the average annual extraction was more than 60,600 acre feet.

The annual overdrafts since 1932 resulted in a continuing and progressing lowering of the ground water elevation which permitted salt water infiltration, and if allowed to continue unabated would result in a progressively increasing area of salt water infiltration. This would lead to the unreasonable depletion and eventual destruction of the ground water in the basin as well as the elimination of the basin as a common source of potable water supply. These facts had been a matter of common knowledge among the producers of water in the basin area for more than 17 years preceding the filing of the amended complaint in 1949 [i.e., since 1932].

The court defined the prescriptive rights owned by the various parties as the highest continuous annual production of water from the basin put to beneficial use through reasonable methods of use and diversion for any period of five successive years before 1949 as to which there had been no cessation of use during any subsequent period of five successive years before 1949, and determined the 1949 prescriptive rights of the parties. By adjusting the 1949 prescriptive rights to reflect the rights acquired, transferred, lost or abandoned by certain parties since 1949, the court arrived at the "adjudicated rights" (or lack thereof) of the parties. Hawthorne had an "adjudicated right" to 1,882 acre feet of water annually, somewhat more than the annual right of 1,846 acre feet it had claimed in its answer to the original complaint. All the water taken by each of the parties was taken openly, notoriously and under a claim of right which was continuously and uninterruptedly adverse to any and all claims of each of the other parties.

Because the total amount of all the adjudicated rights (64,064.09 acre feet) was greater than the "safe yield" of the basin, it was necessary to limit the withdrawals of the parties to the "safe yield." As an immediate reduction would result in undue hardship to the parties, the reduction was to take place over a reasonable period of time. The court provided for an orderly and progressive reduction, including a carry-over from one water year to the next (i.e., from October 1–September 30), the taking of additional water for emergencies, and an exchange pool. As the result of the 1955 voluntary interim agreement, the signatories had reduced their taking of water from 66,500 acre feet per year in 1954-1955 to 62,000 acre feet per year. Accordingly, the exchange pool provisions of the interim agreement, demonstrating a practical method of making water available to meet the requirements of the parties, were to be made binding on all signatories and all other parties who indicated a willingness to be bound thereby.

The court concluded that all parties who had no rights to extract water were enjoined and that all of the "adjudicated rights" were established, were without priority, and of the same legal effect with reference to each other. All of the adjudicated rights were subject to the condition that the water when used be put to beneficial use through reasonable methods of use and diversion and subject to a pro rata reduc-

tion if required. The court enjoined the parties from extracting on or after October 1, 1961, any larger amounts of water than their adjudicated rights subject to the carryover from one water year to the next, emergency withdrawal and the exchange pool provisions. The court concluded that the taking of water under the exchange pool provision would not be "adverse" to the other parties, that none of the parties should recover his costs as against another party, appointed the Watermaster, and reserved jurisdiction to review its' determination of the safe yield.

Hawthorne concedes that the facts are not in dispute and does not question the retained jurisdiction of the court to meet future problems and changing conditions with expert advice and assistance of the referee (Wat. Code, § 2019; *City of Pasadena* v. *City of Alhambra*, 33 Cal.2d 908 [207 P.2d 17]), but Hawthorne argues that the following prejudicial errors require a reversal of the judgment as to its right to ground water in the basin: (1) the trial court did not consider Hawthorne's substantive rights under section 1007 of the Civil Code; (2) the trial court erroneously used 1949, the time of filing of the amended complaint, as the base year in computing the prescriptive rights of the parties, instead of 1945, the time of the filing of the original complaint; and (3) the judgment failed to distinguish between the prescriptive and overlying rights of the parties. Although none of these matters were raised below and the record permits inferences of estoppel and invited error on the part of Hawthorne, we will discuss the merits in fairness to all parties and particularly the trial court, which has labored so long to fully and fairly resolve the rights of the parties.

■ There can be no question that the trial court had authority to limit the taking of ground water to protect the supply and prevent the eventual depletion of the basin (*City of Pasadena* v. *City of Alhambra, supra,* p. 924). The question presented is whether the trial court properly allocated the burden of curtailing the total production to the safe yield. As the stipulation of the other parties concerning the reduction in pumping is not binding on Hawthorne, its rights in relation to the other producers must be determined as if there had been no agreement. ■ The question of who shall bear the burden of curtailing the overdraft, and in what proportion, depends upon the legal nature and status of the particular water right held by each party. ■ The

applicable rules were set forth by our Supreme Court in *City of Pasadena* v. *City of Alhambra, supra,* pages 925, 926, as follows:

Rights in water in an underground basin are classified as overlying, appropriative and prescriptive. An overlying right, analogous to that of the riparian owner in a surface stream, is the owner's right to take water from the ground underneath for use on his land within the basin or watershed; it is based on the ownership of the land and is appurtenant thereto. ■ The right of an appropriator, however, depends upon the actual taking of water. Where the taking is wrongful, it may ripen into a prescriptive right. ■ Any person having a legal right to surface or ground water may take only such amount as he reasonably needs for beneficial purposes (*Katz* v. *Walkinshaw,* 141 Cal. 116 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236]; *Peabody* v. *City of Vallejo,* 2 Cal.2d 351 [40 P.2d 486]; Cal. Const., art. XIV, § 3). ■ Public interest requires that there be the greatest number of beneficial users which the supply can yield, and water may be appropriated for beneficial use subject to the rights of those who have a lawful priority (*Peabody* v. *City of Vallejo, supra*). ■ Any water not needed for the reasonable beneficial use of those having prior rights is excess or surplus water and may rightly be appropriated on privately owned land for non-overlying use, such as devotion to public use or exportation beyond the basin or watershed (*City of San Bernardino* v. *City of Riverside,* 186 Cal. 7 [198 P. 784]). ■ When there is a surplus, the holder of prior rights may not enjoin its appropriation (*Peabody* v. *City of Vallejo, supra*). Proper overlying use, however, is paramount and the rights of an appropriator, being limited to the amount of the surplus (*City of Lodi* v. *East Bay Mun. Utility Dist.,* 7 Cal.2d 316 [60 P.2d 439]), must yield to that of the overlying owner in the event of a shortage, unless the appropriator has gained prescriptive rights through the taking of nonsurplus waters. ■ As between overlying owners, the rights, like those of riparians, are correlative; each may use only his reasonable share when water is insufficient to meet the needs of all (*Katz* v. *Walkinshaw, supra*). ■ As between appropriators, however, the one first in time is the first in right, and a prior appropriator is entitled to all the water he needs, up to the amount he has taken in the

past, before a subsequent appropriator may take any (*City of San Bernardino* v. *City of Riverside, supra*, pp. 26-28).

■■■ Prescriptive rights are not acquired by the taking of surplus or excess water. ■■■ An appropriative taking of water which is not surplus is wrongful and may ripen into a prescriptive right where the use is actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right. ■■■ Appropriative and prescriptive rights to ground water are subject to loss by adverse user. Adverse user commences when the overdraft first occurs. Each taking of water in excess of the safe yield, whether by subsequent appropriators or increased use by prior appropriators, is wrongful because the overdraft, from its very beginning, operates progressively to reduce the total available supply (*City of Pasadena* v. *City of Alhambra, supra*).

We must look at Hawthorne's contentions in the light of the above rules. Hawthorne concedes that it had no overlying rights and its only rights prior to 1937 were those of an appropriator.[3] The overdraft of the basin began before 1932 and the dispute here centers on the proper measurement of Hawthorne's prescriptive rights acquired between 1932 and 1945.

The major contention on appeal is that the trial court failed to give effect to Hawthorne's substantive rights under the 1935 amendment to section 1007 of the Civil Code.[4] Haw-

[3]The referee's report indicated that Hawthorne was incorporated in 1922 and had operated a municipal water system since that date. The entire water supply of the municipal system was obtained from the basin. The first well acquired in 1922 was abandoned in 1925; another well acquired in 1924 was abandoned in 1927; of eight additional wells drilled subsequently, seven are still in service; another well drilled in 1933 was never connected to the municipal water system but merely supplied water for irrigation use until 1942 and was abandoned in 1947. A city operating a municipal water system is an appropriator (*City of San Bernardino* v. *City of Riverside, supra*).

[4]The section reads as follows : ''Occupancy for the period prescribed by the Code of Civil Procedure as sufficient to bar any action for the recovery of the property confers a title thereto, denominated a title by prescription, which is sufficient against all, *but no possession by any person, firm or corporation no matter how long continued of any land, water, water right, easement, or other property whatsoever dedicated to or owned by any county, city and county, city, irrigation district, public or municipal corporation or any department or agency thereof, shall ever ripen into any title, interest or right against such county, city and*

thorne concedes that that the section does not apply to its appropriative rights as these are subject to divestment by the holder of the prior and paramount title if timely action is commenced (*Allen* v. *California Water & Tel. Co.*, 29 Cal.2d 466 [176 P.2d 8]) but only to its *vested* prescriptive rights. It argues that after its prescriptive rights first became vested in 1937 (five years after the commencement of the overdraft in 1932), no new or increased use, no matter how long continued, by any person, firm or corporation could diminish its right because of the 1935 amendment.[5] The effect of this argument is that although Hawthorne's highest continuous uninterrupted extraction for any five year period up to the filing of the complaint was 1,674 acre feet annually, the 1935 amendment forever froze its 1937 prescriptive right on a proportionate basis. Hawthorne argues that if the nonpublic users who claim prescriptive rights acquired after 1937 are eliminated, its share of the total would be increased to 3,170 acre feet annually.

We need not discuss this argument in detail as it is well settled that the computation of prescriptive water rights in an overdrawn basin is quantitative (*City of Pasadena* v. *City of Alhambra, supra*). The rights of the parties are measured by the amounts of the respective takings for the prescriptive period. " 'The right acquired by prescription is only commensurate to the rights enjoyed during the full prescriptive period; and the extent of the enjoyment measures the permanent right.' " (*Eden Township Water Dist.* v. *Hayward*, 218 Cal. 634, 638 [24 P.2d 492]). The fact

---

*county, city, public or municipal corporation, irrigation district, or any department or agency thereof or any agency created or authorized by the Constitution or any law of this State for the administration of any State school, college or university. The exemption of certain classes of governmental property is intended as a limitation and shall not be deemed to subject to the operation of this section any classes of governmental property which would not otherwise be subject thereto."* (Italics added.) The first portion was enacted in 1872; the italicized portion constitutes the 1935 amendment (Stats. 1935, ch. 519, § 1, p. 1592.)

[5]The amendment changed the law regarding prescription against the property of municipal corporations. Prior to 1935, municipal property was exempt from adverse possession only where the public agency acquired an inalienable interest (*Richards* v. *County of Colusa*, 195 Cal. App.2d 803 [16 Cal.Rptr. 232]). Since the amendment, prescription against municipal corporations and other public entities has been barred (*Anderson-Cottonwood Irr. Dist.* v. *Zinzer*, 51 Cal.App.2d 587, 590 [125 P.2d 82]; *City of Oakland* v. *Burns*, 46 Cal.2d 401 [296 P.2d 338]).

that Hawthorne used up to 3,170 acre feet in 1954-1955 does not entitle it to that amount as of 1949.

Hawthorne's "proportionate right" argument based on the 1935 amendment to section 1007 of the Civil Code is an ingenious attempt to revive the theory of allocating water rights on the basis of priority in time which the Supreme Court expressly rejected in *City of Pasadena* v. *City of Alhambra, supra.* The court said at pages 932 and 933: "... [Such an allocation] would not only ignore the fundamental principle that the statute of limitations runs against persons who fail to act when their rights are invaded, *but it would result in an unequal sharing of the burden of curtailing the overdraft in that all pumping conducted under authority of certain of the later appropriations would be completely eliminated, whereas no restriction in amount would be imposed upon pumping based on earlier appropriations. Such a result does not appear to be justified where all of the parties have been producing water from the underground basin for many years, and none of them have acted to protect the supply or prevent invasion of their rights until this proceeding was instituted.*" (Italics added.)

It is true that the effect of the 1935 amendment to Civil Code section 1007 was not argued in *City of Pasadena* v. *City of Alhambra, supra.* However, we need not resolve the question of an alleged inconsistency between the amended statute and the holding in that case, as we are not here confronted with a present disturbance of Hawthorne's 1949 prescriptive rights of withdrawal from the basin. As in *City of Pasadena* v. *City of Alhambra, supra,* all of the prescriptive users have continued to pump water since the size of the basin has made water available despite the overdraft. Thus, the invasion is only a partial one, i.e., a possible interference with respect to appellant's rights to continue to pump at some future date. No pumping by any one user has created an overdraft which would operate to make it impossible for all to continue to take at the same rate for some time in the future. No reduction has yet been ordered and no reasonable likelihood of such an occurrence is shown to be imminent. The creation of the water replenishment district under sections 60000 et seq. of the Water Code, development of new sources of water, a possible abandonment of prescriptive rights and other factors, may altogether eliminate the threat of future curtailment. In the event that a shortage requiring a reduction

below its prescriptive rights should take place, Hawthorne may obtain relief under that portion of the judgment reserving jurisdiction to make such modification as may be necessary. ▮ The adjudication applies only to existing rights and there can be no declaration as to future rights in water to which a party has no present right (*City of Pasadena* v. *City of Alhambra, supra,* at pp. 935 and 937).

▮ Even assuming arguendo that Hawthorne had established a present invasion of its rights, the record indicates that it should be precluded on equitable grounds from invoking any benefit from the 1935 amendment to section 1007 of the Civil Code. ▮ A party seeking relief in an equitable proceeding must do equity and satisfy all equitable claims (*United States* v. *Fallbrook Public Utility Dist.,* 193 F.Supp. 342-348; *District Bond Co.* v. *Pollack,* 19 Cal.2d 304, 307 [121 P.2d 7]; *People* ex rel. *Mosk* v. *Barenfeld,* 203 Cal.App.2d 166, 177-179 [21 Cal.Rptr. 501]). ▮ Hawthorne is attempting to establish annual water rights to 3,170 acre feet which is far in excess of the extraction of 1,846 acre feet sought in its answer. The fact is the court allocated Hawthorne 1,882 acre feet annually which is somewhat in excess of the amount the city had actually prayed for.

Furthermore, Hawthorne had notice of all proceedings but chose not to raise its present arguments in the trial court. It was well aware of the fact that over a period of more than 11 years, the other parties, the referee, the engineers, and the court spent substantial amounts of time and funds to gather all of the facts and work out the claims of the many parties. Conceivably if Hawthorne had presented some of its contentions below, the referee would have had to investigate additional facts. By its answer and inaction, Hawthorne invited the judgment which it now attacks (3 Witkin, Cal. Procedure, Appeal, § 92, p. 2257 et seq.)

The inequity of Hawthorne's position is further demonstrated by its contention that only its rights need be redetermined. If, in fact, the trial court erred in its interpretation of Civil Code section 1007, only the reversal of the entire judgment could protect the interests of all the parties. ▮ The test of whether a portion of a judgment appealed from is so interwoven with its other provisions as to preclude an independent examination of the part challenged by the appellant is whether the matters or issues embraced therein are the same as or interdependent upon the matters or issues

not attacked (*American Enterprise, Inc.* v. *Van Winkle,* 39 Cal.2d 210 [246 P.2d 935]). It is obvious that the rights of the many nonappealing parties here are so interwoven with the whole that Hawthorne's appeal affects all the other parties (*Blache* v. *Blache,* 37 Cal.2d 531 [233 P.2d 547]; *Estate of Murphey,* 7 Cal.2d 712 [62 P.2d 374]).

Hawthorne next argues that the trial court should have computed the prescriptive rights of the original parties as of the date of the filing of the original complaint in 1945 and that by using the year 1949, when the amended complaint was filed, it has diminished Hawthorne's proportionate share. It contends that when additional parties are brought in by an amendment to the complaint, the complaint speaks as to the original parties only as of the time of the original filing.[6] There is no merit in this contention as the complaint was amended not only to bring in additional parties but also to enlarge the scope of the proceedings to include the adverse claims of *all* the parties against each other, thus creating new causes of action. The amended complaint asked the court to determine the rights of all the parties *inter se.* The trial court's order directing the amendment of the complaint to bring in additional parties and extend the scope of the action was made pursuant to its authority under section 389 of the Code of Civil Procedure as it then read.[7] Whether all indispensable parties were before the court is determined by the relief granted (*Orange County Water Dist.* v. *City of Riverside,* 173 Cal.App.2d 137 [343 P.2d 450]). The requirement that indispensable parties be before the court is mandatory (*Hartman Ranch Co.* v. *Associated Oil Co.,* 10 Cal.2d 232, 265 [73 P.2d 1163]). A failure to join indispensable parties necessary to the relief involved constitutes a jurisdictional defect (*Sime* v. *Malouf,* 95 Cal.App.2d 82, 116 [212 P.2d 946, 213 P.2d 788]). The judgment finally rendered was an inter se adjudication of the rights of all the parties among themselves.

Hawthorne relies on *Morrow* v. *Superior Court,* 9 Cal.App. 2d 16 [48 P.2d 188, 50 P.2d 66], cited with approval in *Bank*

---

[6]Hawthorne correctly concedes that since the new parties were brought in more than three years after the date of the original summons (Code Civ. Proc., § 581a), the amended complaint could not relate back to 1945 as to the new parties (*Taliaferro* v. *Riddle,* 167 Cal.App.2d 567 [334 P.2d 950]).

[7]i.e., prior to the 1957 amendment.

*of California* v. *Superior Court,* 16 Cal.2d 516 [106 P.2d 879]. In the *Morrow* case, however, the appellate court concluded that the trial court had jurisdiction to make a complete determination of the controversy in question without the proposed addition of the new defendant. ▇▇▇ In the instant case, the new parties were essential and the court had no jurisdiction to consider the rights of the additional and original parties inter se until 1949 when the amended complaint was filed. At this time, a new cause of action arose (*United States* v. *Fallbrook Public Utility Dist., supra,* p. 358), and the court properly computed the prescriptive rights of the parties on the basis of their use from 1945 to 1949.

Finally, Hawthorne argues that the trial court failed to distinguish between the overlying and prescriptive rights of the parties. It contends that the judgment erroneously treats them all as newly acquired prescriptive rights without regard to their origin. Hawthorne has not shown that this omission, even if erroneous, resulted in a miscarriage of justice as to its rights (*Carr* v. *Duncan,* 90 Cal.App.2d 282 [202 P.2d 855]). ▇▇▇ We think that the court properly concluded that there was no necessity for distinguishing between the overlying users and appropriators. The object of the judgment was to relieve the overdraft and prevent salt water intrusion. The court followed *City of Pasadena* v. *City of Alhambra, supra,* where it was held that the distinction was not presently important[8] although it might become so in ascertaining the rights of the parties in the event of possible future contingencies that may never occur.

▇▇▇ The solution adopted by the trial court in this case after so many years of diligence is completely in accord with the rule of reasonable and beneficial use of water expressed by section 3 of article XIV of the state Constitution. This rule dictates that when the supply of water is limited, as in the overdrawn basin here in question, the public interest requires that there be the greatest number of beneficial users which the supply can yield (*Peabody* v. *City of Vallejo, supra*). It has also been held that under the constitutional provision, the trial court has the duty of working out a physical solution if possible and if none is suggested by the

[8]The court said at page 932: "We need not determine whether the overlying owners involved here retained simply a part of their original overlying rights or whether they obtained new prescriptive rights to use water."

parties to work out one independently of the parties (*Rancho Santa Margarita* v. *Vail*, 11 Cal.2d 501 [81 P.2d 533]). Here, because of Hawthorne's failure to appear, the solution as to its rights had to be worked out independently. As in *City of Pasadena* v. *City of Alhambra, supra*, at p. 933: ''. . . it seems probable that the solution adopted by the trial court will promote the best interests of the public, because a *pro tanto* reduction of the amount of water devoted to each present use would normally be less disruptive than total elimination of some of the uses.''

### Sidebotham's Appeal

We turn next to the appeal of Sidebotham from the judgment and from the order denying its motions to vacate and set aside the judgment. On the appeal from the judgment, the contentions are that after the death of Sidebotham's attorney, the respondents failed to serve a written notice to appoint a new attorney as required by section 286 of the Code of Civil Procedure, that Sidebotham did not receive notice of the trial pursuant to section 594 of the Code of Civil Procedure and that consequently, the court had no jurisdiction. On the appeal from the order denying the motions to vacate the judgment, the contention is that the evidence is insufficient to support the finding that Sidebotham had waived section 286 of the Code of Civil Procedure. As the contentions concerning Code of Civil Procedure section 286 are substantially similar and based on identical facts in both appeals, we will discuss them together.

The record reveals that Sidebotham, Inc. and Edward R. Sidebotham, a stockholder, were two of the named defendants in the original complaint. On June 18, 1946, they filed their verified answer by their attorney, Alfred L. Black, Jr., generally denying the allegations of the complaint and setting forth that Sidebotham's annual use of water from the basin was approximately 188 acre feet. Exercising the option granted by the court to all original defendants, Sidebotham did not file an answer to the amended complaint. On September 15, 1952, the referee's report was filed and notice thereof was served on Sidebotham by mail addressed to its attorney, Mr. Black. This report indicated that Sidebotham, Inc. had a well in existence but the production was unknown to the referee because insufficient data was made available to him.

On several different occasions, a water resources engineer attempted to obtain information about Sidebotham's ex-

traction and use of water from the basin. Sidebotham consistently took the position that it was no concern of the referee how much water it was extracting from the basin. Subsequently, the supervising hydraulic engineer wrote a letter to Sidebotham with a copy to Mr. Black advising of the inability of the referee to estimate the ground water production from the well located on Sidebotham's property and requested the data needed to confirm Sidebotham's estimate. This letter was not answered.[9] Thus, the subsequent reports of the referee allocated no 1949 prescriptive rights to Sidebotham.

At the continuance of the trial begun in 1956, the trial court ordered that appropriate notices be henceforth given to all parties of all proceedings before the court. Prior to the beginning of the continued trial on July 21, 1961, the attorney for the principal respondent filed a notice of further trial which had been duly served on Sidebotham. Sidebotham did not appear.

In accordance with the various reports of the referee, the trial court found that Sidebotham was not entitled to any water rights. On October 20, 1961, Sidebotham filed a timely notice of appeal from the judgment and thereafter on January 30, 1962, filed its first motion to vacate the judgment, declaring that Sidebotham's attorney of record, Alfred L. Black, Jr., died on January 30, 1951, and that Sidebotham had not received any notice of the proceedings in the entire matter since 1951 except for the 1958 order for the third payment of the interim expenses of the referee. On February 5, 1962, Sidebotham filed its second motion to vacate the judgment,[10] declaring that after the death of its attorney Black, all of the further proceedings in the case proceeded to judgment contrary to the mandatory provisions of section 286 of the Code of Civil Procedure. At the hearing on both motions held on February 14, 1962, Sidebotham introduced the death certificate showing that Black died on January 30, 1951, as well as declarations of other stockholders and mem-

---

[9]The order urged all parties to cooperate with the referee and its engineers.

[10]Although both motions relied on Code of Civil Procedure section 473 and asserted that the judgment was taken against Sidebotham through its mistake, inadvertence, surprise and excusable neglect, these matters have not been argued on appeal and are, therefore, deemed abandoned as separate grounds on appeal (*Record Machine & Tool Co.* v. *Pageman Holding Corp.*, 172 Cal.App.2d 164, 169 [342 P.2d 402]).

bers of the board of directors. The respondents filed numerous declarations indicating that they were not aware of Black's death until 1962. The trial court denied both motions on the grounds that Sidebotham must be considered to have waived the provisions of section 286 of the Code of Civil Procedure and that appellant had five days' notice of the July 21, 1961 trial, pursuant to section 594 of the Code of Civil Procedure.

Sidebotham's chief contention is that the evidence is insufficient to support the finding of waiver by the trial court. Section 286 of the Code of Civil Procedure provides: "When an attorney dies, or is removed or suspended, or ceases to act as such, a party to an action, for whom he was acting as attorney, must, before any further proceedings are had against him, be required by the adverse party, by written notice, to appoint another attorney, or to appear in person." The section applies only when an attorney has died or ceased to be an attorney and not when he ceased to act for his client in a particular case (*Gion* v. *Stroud,* 191 Cal.App. 2d 277 [12 Cal.Rptr. 540]). The death of Mr. Black on January 30, 1951, was admitted by the respondents and accepted by the court as a proven fact. Sidebotham thus argues that the written notice requirement of this section is mandatory and since admittedly there was no compliance therewith, the court was deprived of jurisdiction in this matter.

As all of the evidence in support of the motions to vacate the judgment consisted of written declarations, the applicable rule on appeal is that those affidavits favoring the contention of the prevailing party establish not only the facts stated therein but also facts which reasonably may be inferred therefrom (*Waco-Porter Corp.* v. *Superior Court,* 211 Cal.App.2d 559 [27 Cal.Rptr. 371]; *Griffith Co.* v. *San Diego Col. for Women,* 45 Cal.2d 501 [289 P.2d 476, 47 A.L.R.2d 1349]). When there is a substantial conflict in the evidence, a determination of the controverted facts by the trial court will not be disturbed. In considering an appeal from an order granted on a motion based on affidavits which involves a determination of a disputed question of fact, the affidavits favoring the respondents are accepted as true (*Bonelli* v. *Chandler,* 165 Cal.App.2d 267 [331 P.2d 705]).

The finding of the trial court that the appellant was not taken unawares by the death of its attorney is amply supported by substantial evidence. On June 18, 1946, when

Alfred Black filed the original answer for Edward Roy Sidebotham and Sidebotham, Inc., Mrs. Eliza Sidebotham was the president and general manager of the corporation. She remained in that capacity until February of 1951. However, during 1949 and 1950, Edward Roy Sidebotham was actively in charge. He became president in 1951 and remained as president until his own death in March, 1955. Thus, Edward Roy Sidebotham, who was himself named as a defendant and appeared with the corporation in the answer, was president for four years after the death of Black. It is a reasonable inference that Edward Roy Sidebotham knew that his attorney had died.

The court's finding that Sidebotham engaged in activities in its own proper person in this action before and after the death of Black is likewise supported by the declarations. Sidebotham consistently took the position that its extractions from the West Coast Basin were no concern of the referee, and refused to supply the information requested to permit the referee to check its estimates. In 1950, Sidebotham paid $298.60, its portion of the first interim assessment of the referee's expenses. The record does not indicate whether this order for interim payment was served on Mr. Black or Sidebotham. In July of 1958, the referee noticed a motion ratifying the order for the second interim payment of his expenses and for an order requesting a third interim payment of $207.58 from Sidebotham, Inc. and Edward Roy Sidebotham. A copy of the notice and attached order were served by mail on Black who had then been dead for seven years. The order assessing its portion of the third interim payment was subsequently mailed to Sidebotham. Sidebotham's president admitted receipt of this order about August 28, 1958, and payment thereof sometime before December, 1958.

In 1961, the referee revised his method of calculating charges[11] and determined that since Sidebotham had no 1949 prescriptive rights, its total interim payments of $506.18 should be refunded. On June 16, 1961, a notice of the filing of the referee's final report and a copy of the statement and apportionment of the referee's total expenses were served by certified mail on Sidebotham. The notice gave title of the court and cause and the number of the case. The notice was

[11]Initially, the charges were based on the average annual extractions shown in the 1952 report of the referee; in 1961, the charges were based on the 1949 prescriptive rights.

receipted "E. J. Sidebotham & Sons, John Beall, (L.B.M.)." The notice was examined and filed by John D. Robertson, the manager, and Mabel Panek, the head bookkeeper of Chandler's Palos Verdes Sand and Gravel Company, the then owner of all the stock of Sidebotham. The court's final order approving the total expenses of the referee and authorizing the refund of $506.18 to Sidebotham, dated July 21, 1961, was served on Sidebotham August 10, 1961. On September 14, 1961, a copy of the judgment showing that Sidebotham had no water rights was served on Sidebotham. On September 27, 1961, a state warrant of $506.18 was issued to Sidebotham and admittedly endorsed and cashed by Sidebotham's president Chandler.

As we recently stated in *Gion* v. *Stroud,* 191 Cal. App.2d 277 at p. 280 [12 Cal.Rptr. 540], the obvious purpose of section 286 is to provide for notice to a party who might otherwise be taken unawares. Like any other legal right, this protection may be waived (cf. *Barron* v. *Deleval,* 58 Cal. 95 and *Wall* v. *Heald,* 95 Cal. 364 [30 P. 551], concerning waiver of Code Civ. Proc., § 476). The argument on appeal is that there was no waiver because Sidebotham's president signed the 1961 check in complete ignorance of the entire proceedings. However, the admitted receipt of the 1958 order for payment of interim expenses and the prompt payment thereof indicates Sidebotham's knowledge of the proceedings in 1958 when A. C. Mueller was its president and general manager. Sidebotham has not filed any declaration of A. C. Mueller denying the 1958 transaction nor any declarations to support its contentions that it was deprived of notice by the extrinsic fraud of its adversaries.

As for Sidebotham's other declarations indicating its ignorance of these proceedings, if these declarations were uncontradicted and had been believed by the trial court, they would have warranted a setting aside of the judgment and orders. But these declarations were not uncontradicted and were not believed by the trial court (*Wendell* v. *Wendell,* 111 Cal.App.2d 899 [245 P.2d 342]). Our function begins and ends with a determination that there is a conflict of substantial evidence on the chief issue (*Florez* v. *Groom Development Co.,* 53 Cal.2d 347, 354 [1 Cal.Rptr. 840, 348 P.2d 200]; *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]). Clearly, Sidebotham has failed to demonstrate that there is no substantial evidence to support the challenged

finding (*Davis* v. *Lucas,* 180 Cal.App.2d 407, 409-410 [4 Cal. Rptr. 479]). The court properly concluded that Sidebotham was not taken unawares and had waived the notice provisions of section 286 of the Code of Civil Procedure (*Wall* v. *Heald, supra*).

Furthermore, Sidebotham's failure to cooperate with the referee and supply the necessary data throughout the entire proceedings was the basis of the judgment that it had no water rights in the basin. The party alleging the existence of water rights has the burden of proof (52 Cal.Jur.2d § 482). Sidebotham deliberately failed to meet this burden. Thus, Sidebotham is, as a matter of law, estopped from requesting relief under section 286 of the Code of Civil Procedure or seeking a reversal of the judgment so that its rights can be determined.

As indicated above, on the appeal from the judgment, Sidebotham also argues that the court was without jurisdiction to proceed because it did not receive proper notice of the trial as required by section 594 of the Code of Civil Procedure. Sidebotham contends that the notice was invalid because it had been mailed to its Wilmington office that had been closed. This contention is based on the general manager's affidavits. The record shows that the notice of further trial set for July 21, 1961, was served on July 12, 1961, by mail on Sidebotham at 751 East L., Wilmington, California. At the beginning of the trial, the notice and affidavit of service were called to the attention of the court which ordered them filed. The affidavit of service is itself independent proof of Sidebotham's receipt of the notice (*City of Los Angeles* v. *Young,* 118 Cal. 295 [50 P. 534, 62 Am.St.Rep. 234]).

Apart from the affidavit, the record shows that the notice of the filing of the 1961 report of the referee, mailed to Sidebotham at the same address a few weeks earlier on June 16, 1961, was duly received; the same is true of the final order approving the referee's total expenses, served on August 10, 1961, the copy of the judgment mailed on September 14, 1961, and the warrant for $506.18 on September 27, 1961. It would strain the credulity of any court to believe that, of all these documents, only the jurisdictional notice of the time and place of trial required by Code of Civil Procedure section 594 failed to reach Sidebotham. At the most, Sidebotham's denial raised a conflict which has been resolved

against it by the trier of fact (*Idaho Maryland Mines Corp. v. Industrial Acc. Com.*, 174 Cal.App.2d 693, 694-695 [345 P.2d 109]). The reasonable inference is that if the Wilmington office was closed after June 16 and before July 12, the document, like all of the others, was duly forwarded (Code Civ. Proc., § 1963, subd. 24; *Vaughn* v. *Jonas*, 31 Cal.2d 586 [191 P.2d 432]). We conclude that the trial court properly found that Sidebotham had five days' notice of time of trial pursuant to section 594 and that no question of jurisdiction was presented.

The judgment and the order denying the motions to vacate are affirmed.

Shoemaker, P. J., and Agee, J., concurred.

The petitions for a rehearing were denied March 18, 1964, and appellants' petition for a hearing by the Supreme Court was denied April 15, 1964.